In re MALDEN MILLS INDUSTRIES,
INC., et al., Debtors.

Nos. 01–47214–JBR, to 01–47217–JBR.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 8, 2002.

Richard E. Mikels, John T. Morrier, Mintz, Levin, Cohn, Ferris, Glovsky and

Popeo, P.C., Boston, MA, Richard Langerman, James T. Wallack, Goulston & Storrs, P.C., Boston, MA, David J. Byer, Kevin T. Lamb, Jennifer K. Lawson, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Timothy A. French, Daniel J. Sepanik, Fish & Richardson, PC, Boston, MA, for debtors.

Andrew Z. Schwartz, Kenneth S. Leonetti, Foley, Hoag & Eliot LLP, Boston, MA, David B. Madoff, Cohn, Kelakos, Khoury, Madoff & Whiteshell LLP, Boston, MA, for Official Committee of Unsecured Creditors.

Lee Antanasi, Sidley, Austin, Brown & Wood LLP, New York City, William J. Hanlon, Schnader, Harrison, Goldstein & Manello, Boston, MA, for General Electric Capital Corporation

Richard King, Worcester, MA, for United States Trustee.

## MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

Before the Court are several fee applications for interim compensation pursuant to 11 U.S.C. § 331.[1] Pursuant to this Court's Order Granting Motion to Establish Inter-

---

1. The applications are: First Application of Fish & Richardson PC For Interim Compensation [# 361]; First Application For Allowance and Payment of Compensation for Services Rendered for the Law Firm of Testa, Hurwitz & Thibeault, LLP, as Special Trademark and Copyright Counsel to the Debtors and Debtors in Possession [# 362]; First Application For Compensation and Reimbursement of Expenses for Sidley Austin Brown & Wood LLP as Counsel for General Electric Capital Corporation for the Period November 29, 2001 through March 31, 2002 [# 364] and the Supplement thereto [# 531]; First Interim Application For Compensation and Reimbursement of Expenses for Schnader Harrison Goldstein & Manello as Counsel for General Electric Capital Corp. for the Period November 29, 2001 through March 31, 2002 [# 366] and the Supplement thereto [# 530]; First Application of Zolfo Cooper Management, LLC For Compensation for Services

Rendered and Reimbursement of Expenses as Restructuring Officers of the Debtors for the Period from November 30, 2001 through March 31, 2002 [# 367] and the Supplement thereto [# 540]; First Interim Application For Compensation and Reimbursement of Expenses of Foley, Hoag & Eliot LLP as Counsel to The Official Committee of Unsecured Creditors [# 369]; First Interim Application of KMPG LLP as Financial Advisors to the Committee For Interim Allowance of Compensation and Reimbursement of Expenses for the Period from December 7, 2001 through March 31, 2002 [# 370] and the Supplement thereto [# 532]; First Interim Application of Goulston & Storrs, PC For Compensation and Reimbursement of Expenses [# 363]; First Application For Interim Compensation by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC [# 365]; First Application By Ernest & Young Corporate Finance

im Compensation Procedures [# 115] and the Modification to Interim Compensation Order and Order to File Fee Applications [# 235][2] (collectively, the "Compensation Orders"), the professionals have been receiving payment of all of their invoiced fees and expenses on a monthly basis.[3] Based in part upon the Court's review of the monthly summaries of the fees and expenses, the Court required the professionals to file the interim fee applications presently before the Court. The applications cover the period from November 21, 2001 (the "Petition Date") through and including March 31, 2002, a period of a little more than four months. The compensation sought by the applicants for this period aggregates to over $3.5 million in fees and expenses.[4]

Contemporaneously with this decision, the Court has issued a decision in *In re ACT Manufacturing Corporation, et al.,* 281 B.R. 468 (Bankr.D.Mass.2002). In the *ACT* decision, the Court set forth many principles intended to guide all fee applicants in the future and thus will not repeat those points, especially as many of the professionals are seeking reimbursement in both proceedings. The Court, however, notes, as it did in *ACT,* some troubling points that the professionals may wish to address in subsequent applications although the list is not exhaustive by any means. Before turning to the specific applications, however, a brief presentation of the facts of these cases will help put the Interim Compensation Orders and the fee requests in context.

## STATEMENT OF FACTS

Malden Mills Industries, Inc. ("Malden Mills"), the principal operating entity and

---

LLC For Compensation and Reimbursement of Expenses For Ernst & Young Corporate Finance LLC as Financial Advisor For Sidley Austin Brown & Wood LLP as Counsel For General Electric Capital Corporation For The Period November 29, 2001 Through March 31, 2002 [# 415] and the Supplement thereto [# 541].

The hearing on the Goulston application was continued by agreement of the parties and therefore was heard separately. The Court's comments on that application, however, are included in this decision.

The following objections or responses to the foregoing applications were received: Statement and Reservation of Rights by GE Capital To First Interim Application Of Goulston & Storrs, P.C. For Compensation and Reimbursement of Expenses [# 444] and the Creditors' Committee's Limited Objection and Amended Objection to the Application of Goulston and Storrs [# 442 and # 449]. The Creditors' Committee's Objection and Limited Objection, along with their attachments, were originally filed under seal but redacted copies have been unsealed.

2. The Modification clarified that the professionals retained by, or on behalf of, the pre

and post-petition lenders needed to file fee applications. *See* 11 U.S.C. § 506(b) (holder of oversecured claim is entitled to *reasonable* fees if agreement so provides) and Fed. R.Bankr.P.2016 ("An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate *shall file* with the court an application....") (emphasis added).

3. The procedure established by the Interim Compensation Orders is identical to that adopted by this Court in *In re ACT Manufacturing Corporation, et al.,* Chapter 11 Case Numbers 01–47641 through 01–47644, and discussed in the *ACT* fee decision issued contemporaneously herewith. The Court reiterates the admonition set forth in *ACT,* namely that, absent the unusual facts of these cases, the Court is not inclined to permit interim payments, assuming such are appropriate in light of the facts of a given case, to exceed 75% of invoiced fees and 100% of invoiced expenses.

4. This figure does not include the compensation of the 29 so-called "ordinary course" professionals, many of whom also need to file fee applications pursuant to the Court's order allowing their employment.

the parent corporation of the three co-debtors, ADS Properties Corp., AES Properties Corp., and Malden Mills Distributors Corp. (collectively with Malden Mills, the "Debtors") filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. The cases are being jointly administered. In addition to its co-Debtors, Malden Mills owns three other subsidiaries although only the German subsidiary is operational.[5]

Malden Mills is the largest textile manufacturer of synthetic fleece in North America and markets its products under the brand name Polartec®. In December 1995 its Lawrence, Massachusetts plant was destroyed by fire.[6] The Debtors' insurance covered only about 75% of the $400 million costs associated with the rebuilding. In November 1998 Malden Mills, having settled its claims against its own property insurers, Commerce and Industry Insurance Company and Federal Insurance Company (collectively, the "Insurers"), joined with its Insurers in commencing an action against numerous defendants in state court (the "Fire Litigation") and sought over $400 million for damages incurred as a result of the fire. That action, which the Debtors describe as their single largest asset, was removed postpetition and is presently scheduled for trial in the United States District Court.[7]

In October 1999 the Debtors and certain other affiliates entered into credit and term loan agreements with General Electric Capital Corporation ("GECC"), for itself and as agent for a group of lenders.[8] The line of credit and the term loans are allegedly secured by a lien on all the Debtors' assets. Recently, on or about the last day for the Creditors' Committee to challenge the validity of those liens, it filed such a challenge. That action has been stayed by agreement of the parties pending the outcome of the Fire Litigation.

As of the Petition Date the aggregate outstanding balance on the line of credit and the two term loans was approximately $142 million. The Debtors believe that as of the Petition Date the prepetition lenders were undersecured but the Debtors and lenders hoped that, given some time, the value would increase. GECC, as agent for a group of postpetition lenders, which group consists of three of the twelve members of the prepetition lending groups, and the Debtors entered into a financing agreement which was approved by the Court. That agreement provides for the payment of 100% of professional fees on an ongoing basis with a sum devoted to final fees in the event that funding is terminated.[9] The Court permitted the payment

---

5. Malden·Mills owned a fourth subsidiary, Independent Furniture Supply Co., Inc., which was sold postpetition.

6. Malden Mills and its President, Aaron Feuerstein, garnered national attention in the aftermath when Mr. Feuerstein announced that Malden Mills would continue to pay its employees during the rebuilding process.

7. The parties to the Fire Litigation recently reached a settlement, which has not yet been approved by the Court.

8. There are two groups of prepetition lenders, one for the term loans and a separate lending

group for the credit agreement. Some lenders belong to both groups.

9. The prepetition loan documents have not been filed with the Court. The Court expresses no opinion as to whether, if the prepetition lenders are able to establish that they are oversecured, those documents provide for the reimbursement of either the agent or an individual lender for fees of their professionals, including but not limited to a financial advisor. Whether the prepetition lenders are entitled to reimbursement of fees may become a significant issue as some of the lenders' professionals have failed to delineate whether services rendered were performed for the

arrangement in large part because the lenders were willing to finance the cases in the hopes that the value of their collateral would improve. As previously noted, the compensation procedure, including the notice and service requirements, is virtually identical to the one established in *ACT Manufacturing* and discussed in some detail in that opinion.

## FEE APPLICATIONS

Several of the initial applications were deficient and professionals were given the opportunity to supplement their filings. One common problem, most noticeable in the applications of professionals who do not routinely practice in this jurisdiction, was the omission of biographical information. Without information about the education and experience of a professional or paraprofessional, the Court cannot determine the reasonableness of an individual's rate. The Court expects, however, that in the future, all professionals, whether or not they have filed an affidavit attesting to their familiarity with the local rules, will review MLBR 2016–1 carefully and comply with its requirements.

Because the awards requested and that will be granted are interim and therefore subject to further review and adjustment as necessary when the outcome of these cases are known, the Court intends to allow the applications as submitted, or in the case of Ernst & Young Corporate Finance LLC, the financial advisor to the lenders, as agreed to by EYCF and the Creditors' Committee.

### Debtors' Professionals

#### Zolfo Cooper Management, LLC

■ Zolfo seeks an award of $1,116,692.75 in fees and expenses of

$129,341.68. These fees sought are over one-third more than those of Goulston & Storrs, the Debtors' special counsel in several areas, the next highest applicant, and nearly twice those of the debtors' general bankruptcy counsel. That fact alone gave the Court some pause and upon closer inspection of Zolfo's application, there appear to be several troubling areas. As discussed in *ACT Manufacturing*, Zolfo's rate structure is based upon "market rates". Yet at the hearing of Zolfo's fees, Frank Budetti, the principal in charge of this engagement, conceded that he did not know whether the market rates to which he sought to compare Zolfo's fees established separate time charges for individuals performing functions which can only be classified as clerical or ministerial. The Court's experience is that such charges are included in overhead which, in turn, is subsumed within the fee structure of a firm's professionals. Consequently those fees cannot and will not be reimbursed.

Although the Court recognizes that Zolfo's role in these cases was essentially to step in place of the Debtors' own management team, the cost to do so raises issues, including the ones raised in *ACT Manufacturing*, including the expenses of employees living at "homes away from home". Mr. Budetti, who functions as the Debtors' chief operating officer and chief financial officer, lives in Los Angeles, California. He commutes to this area and represented that he did not bill his travel time, except weekday travel to Europe. He as made trips to Germany because, according to Mr. Budetti, 70% of the value of the debtors is in the German subsidiary. That company, however, is not a debtor and the Court questions whether judicious use of

benefit of the pre or post-petition lenders. Although the Court recognizes that there will be some overlap, some services were provided

solely or primarily for the benefit of the prepetition lending group.

management located in Germany might be a better use of resources.

Perhaps even more glaring in these cases is the question of the propriety of continued payment of salary, bonuses, and benefits to the Debtors' senior management when Zolfo's application suggests that there is little in the management of the companies that is not directly under the auspices of Zolfo.

■ Finally, as the United States Trustee pointed out at the fee hearing, Mr. Budetti is a prime offender of the "no lumping" rule, often billing time in 10 hour increments or more. Moreover, this offense is compounded by wholly inadequate descriptions. Charging 10 or more hours to a day described only by such terse notations as "attend to management tasks" is unacceptable and is grounds for a reduction in the amount of fees awarded.

■ Finally, as the Court cautioned at oral argument, some of the time spent by Zolfo personnel appears devoted to tasks which are legal in nature. The Court is still puzzled why Zolfo reviews the pleadings docketed in these cases on at least a weekly basis. That none of the time spent on any given day is "significant", in the words of Mr. Budetti, is immaterial. Professionals, especially those involved in multi-professional cases, must ensure that they do not duplicate work or perform work falling squarely within the purview of another professional. When a professional's work overlaps, he should explain why such work was necessary.

### Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

■ Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz"), general bankruptcy counsel to the Debtors, seeks fees of $610,437.50 and expenses of $27,556.83. The comments regarding Mintz's application in *ACT Manufacturing*, especially in the area of duplication of services, are equally applicable in these cases. There are numerous special counsel, including Goulston & Storrs, P.C., which provides services akin to what general, non-bankruptcy counsel to a company would perform, and the danger for duplication is high. Just as Mintz is admonished not to perform tasks within the scope of special counsel's services, special counsel are cautioned to ensure that they are not rendering services duplicative of those rendered by the general bankruptcy firm. When there are special counsel whose role is not limited to one or two discreet areas, both the special counsel and the general bankruptcy counsel should address, albeit briefly, the measures each has taken to minimize duplication.

### Fish & Richardson P.C.

Fish & Richardson, the Debtors' parent counsel, seeks fees of $40,387.50 and expenses of $9,076.03. Counsel addressed the Court's concerns which centered on how work was divided among the various special patent counsel firms and why Fish & Richardson, which was patent counsel to the Debtors prepetition, needed to spend time "coming up to speed" in some areas. The explanation, namely that the firm was taking over work on patents previously handled by the Debtors' in-house staff, is reasonable but this is the kind of information which, if included in a narrative, is most helpful to the Court's review of the fees prior to any hearings.

### Testa, Hurwitz & Thibeault, LLP,

Testa, Hurwitz & Thibeault, LLP, trademark and copyright counsel to the Debtors, seeks fees of $36,332.00 and expenses of $25.50. The firm is also special counsel with respect to union negotiations and labor disputes. There are at least three different law firms dealing with employ-

ment matters and they must coordinate their efforts to avoid duplication.

### Goulston & Storrs, P.C.

■ Goulston & Storrs seeks fees of $762,260 and expenses of $17,871.34. The firm is special counsel to the Debtors in a variety of areas and the statements in *ACT Manufacturing* should be reviewed carefully by Goulston & Storrs. Special counsel must remember its role is just that, special counsel is not general counsel. The controversy surrounding its fees, however, resulted from an alleged failure to make a full disclosure of its fee arrangement as special litigation counsel in this case.

The Debtors filed their motion to employ Goulston & Storrs as part of the first day pleadings. In the motion the Debtors asked "that this Court, pursuant to § 328(a) of the Code, approve G & S' compensation arrangement in connection with its representation of Malden Mills in litigation against certain defendants seeking damages arising out of the 1995 Fire." Both the motion and the Affidavit of Richard Langerman, a director of Goulston & Storrs, describe the compensation arrangement for the fire litigation as follows:

> Under that certain Full and final settlement Agreement dated June 2, 1997 between Commence [Industry Insurance Company, the Debtors' insurer and co-plaintiff in the fire litigation] and Malden Mills (the "Settlement Agreement"), Commerce and Malden Mills agreed to the full and final settlement of all disputes that had arisen between them relative to the 1995 Fire.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> · G & S represents the Debtor, Commerce and Federal in the Third Party Litigation [that is, the litigation removed from state court and which is the subject of pending motions to settle]. The law

firm of Cozen & O'Connor ("O'Connor") also represents Commerce and federal. Thomas J. Sartory, Alan M. Reisch and James T. Hargrove are the G & S directors primarily responsible for the Third Party Litigation. Eight other G & S attorneys have been actively involved in the Third Party Litigation.

&ast; &ast; &ast; &ast; &ast; &ast;

G & S represents Malden Mills in the Third Party Litigation under an hourly fee arrangement. Mr. Reisch and Mr. Hargrove, who spend a substantial portion of their time on the Third Party Litigation, charge none of their time to Malden Mills. Mr. Sartory charges half of his time on the Third Party Litigation to Malden Mills and half of his time to Commerce and Federal. All other G & S attorneys working on the Third Party Litigation charge one-third of their time to Malden Mills and two-thirds of their time to Commerce and Federal. The Debtors are requesting that this billing arrangement continue on a post-petition basis.

This disclosure, while seemingly complete in its detailed description of the billing arrangement, however, omitted one essential piece of the story: the missing piece is in the Full and Final Settlement Agreement. The Settlement Agreement provides Goulston & Storrs with a contingent fee arrangement in addition to hourly compensation. Although the contingent fee is to be paid exclusively from money otherwise paid to the Insurers under the Settlement Agreement, its existence gives rise to a concern, even if in theory only, that Goulston & Storrs' self-interest in its contingent fee could influence its handling of the litigation to the Debtors' detriment. This concern is heightened when coupled with the Insurers' position that, under the Settlement Agreement, they and not Malden Mills, control the litigation.

Section 327(e) permits employment of an attorney who has previously represented the debtor for a specified special purpose, the so-called "special counsel" if it is in the best interest of the estate and the special counsel "does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter for which such attorney is to be employed." 11 U.S.C. § 327(e). "[A]n 'adverse interest' has been described in pragmatic terms as the 'possess[ion] or assert[ion][of] mutually exclusive claims to the same economic interest, thus creating an actual or potential dispute between rival claimants as to which ... of them the disputed right or title to the interest in question attaches under the valid and applicable law; or (2) [the possession of] a predisposition or interest under circumstances that render such a bias in favor of or against one of the entities.'" *Rome v. Braunstein*, 19 F.3d 54, 58 n. 1 (1st Cir.1994), quoting *In re Roberts*, 46 B.R. 815, 826–27 (Bankr. D.Utah 1985). Whether the contingent fee arrangement and the Settlement Agreement have created the type of predisposition or interest that rise to the level of an adverse interest will be left for another day. But the Court notes that the firm's failure to disclose the arrangement from the beginning of these cases only exacerbates the Court's concern.

■ In addition the non-disclosure itself can provide a separate ground for denial or reduction of fees. *In re Filene's Basement*, 239 B.R. 850, 855 (Bankr.D.Mass. 1999). It was only after the Committee requested the Settlement Agreement, and according to Committee counsel's statements at oral argument that he discussed his concerns about Goulston & Storrs' fail-

ure to disclose the contingent fee, that Goulston & Storrs made a further disclosure. Attorney Langerman supplemented his affidavit to address the contingent fee agreement. The disclosure, however, should have been made voluntarily and as part of the initial application and affidavit.

Goulston now seeks a "comfort" order that its full fee arrangement is approved. Its discomfort is caused by its own failure to fully and fairly disclose its fee arrangement when it sought to be retained and the Court declines to bless this failure at this point in the cases. The Court will address the questions of whether and to what extent adjustments to the fees of Goulston & Storrs should be made upon the completion of the Fire Litigation when all parties have had a sufficient opportunity to review and comment upon this matter and the Court will have the opportunity to review the firm's entire compensation picture.

### The Committee's Professionals

Foley, Hoag & Eliot LLP [10]

■ Foley, Hoag & Eliot LLP ("Foley"), counsel to the Creditors' committee, seeks fees of $397,091.87 and expenses of $11,761.37. Both Foley and KPMG LLP, the Committee's financial advisor, agreed to cap their hourly rates. Attorney Andrew Schwartz, a partner with almost 20 years of experience, agreed to cap his rate at $450 per hour; no other partner working on these cases will bill at a rate higher than $450 per hour. Attorney Kenneth Leonetti, a partner with approximately 9 years of experience, has capped his hourly rate at $335; no associate working on these cases will bill at an hourly rate greater than $335.[11] These rates are rea-

---

10. The firm is now known as Foley Hoag LLP.

11. The application disclosed two instances where the caps were not properly applied and the firm stated it would apply an equal

sonable and under a lodestar analysis, saved the estates approximately $10,000 during the first application period.

As noted in the Court's decision in *In re ACT Manufacturing, Inc.,* issued contemporaneously herewith, the Court found the Committee's narrative descriptions to be very helpful in outstanding the scope of the tasks undertaken by the Committee and the role that work played in relation to the cases as a whole. Equally impressive is the cost-effectiveness that the firm displayed in preparing its fee application. Seven hours costing $2,351 was spent to prepare an approximately $400,000. The firm's approach to the entire application process sets a standard the Court urges other professionals to emulate.

The only area that gives the Court some pause is the cost of having the attorneys analyze financial data provided to the Committee and the Court questions whether and to what extent this work is duplicative of the tasks performed by the Committee's financial advisors. It would be helpful if the professionals address this point in future applications.

## KPMG LLP

KPMG LLP ("KPMG") sought fees of $218,082 and expenses of $953 but in its supplement acknowledged that $1,425 should be credited to the estate because Mr. Darr's time spent attending the Committee formation meeting to procure this engagement should not have been charged to the estate. KPMG agreed to a blended rate of $285 which resulted in savings of $31,205 for the estate. The firm's expenses consist primarily of travel reimbursement and each such entry expressly reflects that the traveler's normal commuting distance has been subtracted from the reimbursement requested.

amount, namely $657, as a credit against the

## The Lenders' Professionals

### Sidley Austin Brown & Wood LLP

Sidley Austin Brown & Wood LLP ("Sidley"), attorney for the agent to both the pre and post-petition lenders, seeks fees of $209,515.75 and expenses of $17,454.91. Sidley represents both the pre and post-petition agent for the lending group and it must take reasonable efforts to record time spent performing tasks for the prepetition lenders and the agent, when the agent is acting in its capacity as agent for the prepetition lending group, from the services it is rendering to the postpetition group and the agent in its capacity as postpetition agent.

■ The Court recognizes that Sidley and the agent's local counsel rarely attended the same hearings and that most often it has been local counsel who appears in Court. This has resulted in a savings for the estates. Some of the firm's expense charges, however, appear impermissible. These include secretarial overtime and document production charges which the firm clarified in its supplement refers to word processing costs. These expenses are overhead.

### Schnader Harrison Goldstein & Manello

■ Schnader Harrison Goldstein & Manello ("Schnader"), local counsel to the lenders, seeks fees of $35,472 and expenses of $1,110.03. Of this amount over $5,000 was spent preparing the fee application. Given Schnader's role in these cases, and the fact that, in addition to the preparation of the fee application, there are only four other categories, this amount appears excessive. And to the extent that Schnader charged for its role in helping prepare *pro hoc vice* motions and affidavits, it will not be reimbursed. While parties are free,

next monthly invoice.

within reason, to choose their professionals, a bankruptcy estate should not bear the expense of such professionals being admitted to practice in this jurisdiction. With an increasing number of attorneys participating in bankruptcies outside of their "home" states, *pro hoc vice* motions are rather commonplace. It has been the Court's experience that most attorneys use boilerplate *pro hoc vice* forms and therefore the unreimbursed cost to the professionals is minimal.

### Ernst & Young Corporate Finance LLC

■ Ernst & Young Corporate Finance LLC ("EYCF") seeks fees of $553,350 and expenses of $13,552. The Creditors' Committee objected [12] and announced at the hearing that the Committee and EYCF reached a settlement whereby EYCF would accept $400,000 plus expenses at this stage of the case and all parties would reserve their right to seek and challenge the deferred amount of fees. The Court agrees that this is an appropriate solution but it was necessitated by a fundamental but common misperception of a Court's role in reviewing fees and expenses incurred by or on behalf of a lender. As this Court has stated earlier in this decision, the Bankruptcy Code and Rules are clear: an entity seeking reimbursement of fees and expenses from a bankruptcy estate must file the appropriate application. *See* 11 U.S.C. § 506(b) (holder of oversecured claim is entitled to *reasonable* fees if agreement so provides) and Fed.R.Bankr.P.2016 ("An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate *shall file* with the court an application....") (emphasis added). EYCK was retained by Sidley, the attorney for the pre and post-petition lenders'

agent, rather than by the agent itself but because reimbursement for EYCF's services is sought from the estate, the firm must file a fee application. EYCF's fee request illustrates why such oversight is essential.

EYCF was originally retained under a flat fee arrangement. Under this arrangement EYCF charged a per diem based on a fee of $162,750 a month. Beginning December 1, 2001 the flat fee became $135,625. In its application EYCF estimates, it spent 850.6 hours. The Creditors' Committee objected because the fees sought, based on EYCF's estimate of time spent, yielded a blended hourly rate in excess of $650. At the hearing EYCF's representative acknowledged that the firm's time records may not strictly reflect time spent because the firm is not as strict in enforcing how time is kept in flat fee engagements. It is possible that some EYCF employees did not enter all time spent on the engagement; it is equally likely that some may have overestimated time spent. In announcing the settlement, counsel to the Creditors' Committee informed the Court that EYCF had produced additional information regarding the time spent on the engagement and based upon the review, the parties agreed that $400,000 was a fair reflection of time spent at hourly rates more in line with what similar professionals would charge. Therein lies the problem with fee arrangements of the type entered into between the lenders' attorney and the financial consultant. Neither the lenders or the attorneys expected ultimately to bear the cost of the financial advisor and therefore neither had a real economic incentive to negotiate EYCF's fees. Without a review of these fees. EYCF might well have received what might be viewed as an approximately

---

**12.** The Creditors' Committee, with Court approval, retained the firm of Cohn Khoury Madoff & Whitesell LLP as special counsel to bring this objection.

25% premium. Although the Court is aware that EYCF has reserved its right to seek the difference between the amount it would have earned under the flat fee arrangement and the $400,000, if EYCF seeks this difference from the estates, it should be prepared to justify the reasonableness of the request.

■ In addition EYCF acknowledged that it continues to perform work for both the pre and post-petition lenders. Yet it is far from clear that the prepetition lenders or their agent may be compensated for this work. Therefore it is incumbent upon the professional to segregate work performed for the postpetition lenders from that done for the benefit of the prepetition group.

One additional concern the Court raised at the hearing is the travel expenses incurred by EYCF. They appear high for a firm that has a Boston location. EYCF, however, informed the Court that the financial advising services rendered is not available at the Boston location. When firms that have local offices need to rely on personnel from outside the area, it would be helpful to inform the Court and parties that the local employees cannot perform the needed functions rather than leave all to wonder why the estates are being charged for airfare, lodging, car rental, and the like.

## CONCLUSION

Separate orders will issue.