**In re ACT MANUFACTURING, INC., et al., Debtors.**

**Nos. 01–47641–JBR to 01–47644–JBR.**

United States Bankruptcy Court, D. Massachusetts.

Aug. 8, 2002.

Richard E. Mikels, Daniel S. Bleck, Deena C. Ethridge, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, Kevin T. Lamb, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Debtors.

Charles L. Glerum, Douglas R. Gooding, Choate, Hall & Stewart, Boston, MA, for Official Committee of Unsecured Creditors.

Richard S. Toder, Morgan, Lewis & Bockius, LLP, New York City, George W. Tetler, III, Bowditch & Dewey, LLP, Worcester, MA, for JP Morgan Chase Bank.

Richard King, Worcester, MA, for United States Trustee.

## MEMORANDUM OF DECISION

JOEL B. ROSENTHAL, Bankruptcy Judge.

Before the Court are several fee applications for interim compensation pursuant to 11 U.S.C. § 331.[1] Bell Electrical Supply

---

**1.** The applications are: Application For Allowance of Interim Compensation for Services Rendered as Bankruptcy Consultants and Special Financial Advisors to the Debtors and Reimbursement of Expenses by Zolfo Cooper, LLC [# 349]; Supplemental Statement to First Application of Zolfo Cooper, LLC For Allowance of Interim Compensation for Services Rendered as Bankruptcy and Special Financial Advisors to the Debtors and Reimbursement of Expenses [# 485]; First Application For Allowance of Attorneys' Fees and Expenses by Morgan, Lewis & Bockius LLP [# 356]; Application For Allowance of Attorneys' Fees and Reimbursement of Expenses by Bowditch & Dewey, LLP, Co-Counsel to JP Morgan Chase Bank [# 357]; First Application For Allowance and Payment of Compensation by Testa, Hurwitz & Thibeault, LLP [# 360]; First Application For Interim Compensation by Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC [# 361]; First Interim Application For Allowance of Fees and Expenses by Choate, Hall & Stewart [# 362]; First Fee Application For Reimbursement of Compensation and Expenses by PricewaterhouseCoopers LLP [# 364]; First Application For Allowance of Interim Compensation by FTI Policano & Manzo [# 365]; Joint Certification Pursuant to MLBR 2016–1(b) Regard-

and H & S Manufacturing Co. filed general objections to the foregoing.[2] Pursuant to this Court's Order Granting Motion to Establish Interim Compensation Procedures [# 94] and the Modification to Interim Compensation Order and Order to File Fee Applications [# 212][3] (collectively, the "Compensation Orders"), the professionals have been receiving payment of all of their invoiced fees and expenses on a monthly basis. Based in part upon the Court's review of the monthly summaries of the fees and expenses,[4] the Court required the professionals to file the interim fee applications presently before the Court. The applications cover the period from December 21, 2001 (the "Petition Date") through February 28, 2002, a period of a little more than two months. The compensation sought by the applicants for this period aggregates to over $2.5 million in fees and expenses.[5]

The Debtors have facilities scattered throughout the United States and, as of the Petition Date, they or their subsidiaries had locations in Mexico, France, the United Kingdom, Ireland, Thailand, and Taiwan, and employed approximately 4,700 individuals world-wide. The subsidiaries in France, the UK, and Thailand have additional operating subsidiaries. Approximately one month prior to the Petition Date, ACT, publicly traded on NASDAQ, had over 17 million shares of common stock outstanding.

From the onset, these jointly administered cases,[6] have been poised to be liquidations within the framework of chapter

---

ing Application For Allowance of Attorneys' Fees and Expenses of Morgan Lewis & Bockius LLP and Application For Allowance of Attorneys' Fees and Reimbursement of Expenses of Bowditch & Dewey, LLP, Co–Counsel to JPMorgan Chase [# 536].

2. The theme of these objections echoes a persistent public, and often a court's, perception of bankruptcy, namely that it "creates a 'feeding trough' for attorneys, accountants and investment bankers.... Several courts have suggested that professionals view bankruptcy cases, particularly chapter 11 cases, as a 'cash cow.'" Cynthia A. Baker, *Other People's Money: The Problem of Professional Fees in Bankruptcy*, 38 Ariz.L.Rev. 35 (1996) (footnotes omitted).

3. The Modification clarified that the professionals retained by, or on behalf of, the pre and post-petition lenders needed to file fee applications. *See* 11 U.S.C. § 506(b) (holder of oversecured claim is entitled to *reasonable* fees if agreement so provides) and Fed. R.Bankr.P.2016 ("An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate *shall file* with the court an application....") (emphasis added).

4. The procedure established by the Interim Compensation Orders is described in the dis-

cussion of the Interim Compensation Orders. The Court cautions professionals who seek such compensation orders that, absent the unusual facts of this case, also set forth in the discussion of the Interim Compensation Orders, the Court is not inclined to permit interim payments, assuming such are appropriate in light of the facts of a given case, to exceed 75% of invoiced fees and 100% of invoiced expenses.

5. This figure does not include the compensation of Lazard Frères & Co., LLC ("Lazard"), the investment banker, whose fees through the same period were in excess of $328,000. By agreement and pursuant to the Court's order employing Lazard, its fees are subject to review under Section 330 although the Court has relaxed the requirement that Lazard provide the type of detailed time entries ordinarily expected from professionals. Nor does it include the so-called "ordinary course" professionals, many of whom also need to file fee applications pursuant to the Court's order allowing their employment.

6. ACT Manufacturing, Inc. ("ACT") and CMC Industries, Inc. are the two operating entities. They, along with ACT Manufacturing U.S. Holdings, LLC and ACT Manufacturing Securities Corporation, are referred to herein collectively as the "Debtors".

11. The Court recently approved the sale of substantially all of the Debtors' assets, including both the domestic operations as a provider of value-added electronics manufacturing services, and the stock of their international subsidiaries. The sale will not yield an amount sufficient to pay the prepetition secured creditors, assuming that their liens are valid and perfected, in full.

■■■ Prior to the hearing on the applications, the Debtors, JPMorgan Chase Bank as agent for the prepetition and postpetition lenders (the "Lenders"), the Official Committee of Unsecured Creditors (the "Committee" or the "Creditors' Committee"), and their respective professionals filed a Stipulation with Respect to the Interim Fee Applications whereby these parties agreed to defer any disputes over fees until an unspecified later date, when the results of these cases are likely to be known. All of the pending applications are interim and the Court therefore could defer ruling on any or all of them until final applications are submitted. 3 COLLIER ON BANKRUPTCY ¶ 331.01[2] (15th ed. rev.2001) ("COLLIER"), citing *In re Child World,* 185 B.R. 14, 17 (Bankr. S.D.N.Y.1995) ("the language of Code § 331 is permissive; nothing in that provision *requires* a court to grant an application for interim compensation").[7] Moreover a court can amend interim awards as necessary. *In re Anolik,* 207 B.R. 34, 38 (Bankr.D.Mass.1997); *In re Taxman Clothing Co.,* 49 F.3d 310, 312 (7th Cir. 1995) ("all interim awards of attorney's fees in bankruptcy are tentative") (citations omitted); COLLIER ¶¶ 331.01[2] and 331.04[1]. The Court, however, has the authority and indeed the responsibility for reviewing and determining whether the fees and expenses, whether paid or unpaid, are reasonable and necessary. 11 U.S.C. § 330(a)(3); *In re Zamora,* 251 B.R. 591, 596 (D.Colo.2000) ("A bankruptcy judge's duty is to conduct a discreet inquiry into every request for attorney fees and that duty cannot be delegated."); *In re Cumberland Farms, Inc.,* 154 B.R. 9, 10 (Bankr.D.Mass.1993); *In re Bank of New England,* 134 B.R. 450, 454 (Bankr. D.Mass.1991). Moreover, in undertaking its review of the various applications, it became apparent that the Court needed to delineate or in some instances remind the applicants of the guidelines applicable to all compensation requests. The Court expects that applicants in future cases will adhere to the parameters articulated in this decision and that the current applicants will incorporate them, to the extent possible,[8] in any other applications they file in this case.

## THE COMPENSATION ORDERS

■■■ Before turning to the parameters this Court expects will guide its fee awards and the applications at hand, it is appropri-

---

7. Such an approach, at least in cases where professionals are not receiving compensation on an ongoing basis, however, ignores the very existence of section 331 and the reason for its adoption, namely, to clarify that professionals do not need to wait until the completion of a case to receive compensation. Section 331 ensures that competent and qualified professionals represent parties in the bankruptcy arena without fear that they will be driven to the brink of financial ruin while awaiting payment for their services. *In re Commercial Financial Services, Inc.,* 231 B.R.

351, 354 (Bankr.N.D.Okla.1999); *In re International Horizons, Inc.,* 10 B.R. 895, 897–98 (Bankr.N.D.Ga.1981); COLLIER ¶ 333.01.

8. The Court recognizes that it may not be cost-effective for the professionals to create new categories or realign the ones they are currently using. Those professionals who were instructed at the outset of the case to use the same categories to the extent possible but failed to do so will be expected to correct this deficiency at no cost to the estate.

ate to address the issue of the use of administrative fee orders such as the Compensation Orders in bankruptcy. The Debtors filed their motion to establish interim compensation procedures as part of the first day motions. It was served on the United States Trustee, all of the members of the secured lending group, including the agent and its counsel, taxing authorities and state attorneys general in the jurisdictions where the Debtors conducted business, the United States Attorney for Massachusetts, the Securities and Exchange Commission, and the twenty largest creditors of each Debtor. The Court held a hearing on the motion a month after it was filed; by then the Creditors' Committee had been formed and had retained its own professionals. No objections to the motion were received. Moreover, the Lenders agreed as part of the post-petition financing agreement, approved by this Court with some modifications, that, provided the Debtors were not in default, they could "pay administrative expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code ...", and in the event of a default, a limited pool of funds would be committed to pay, although perhaps not in full, unpaid but allowed administrative expenses.

The Compensation Orders provide that the professionals are to submit monthly invoices for fees and expenses to Debtors' counsel who then serves those invoices and a summary chart on the Debtors, counsel to the Creditors' Committee, counsel to the agent for the Lenders, and the United States Trustee. If there are no objections to an invoice, the professional receives payment by the Debtor of 100% of his requested amounts. In addition the Court receives and reviews the summary chart, updated on a monthly basis. The chart lists each monthly invoice submitted by a professional and provides a running total of the amounts invoiced for each profes-

sional as well as the payment each has received. The Compensation Orders provide that all fees and expenses received under the Compensation Orders still must be the subject of interim and final fee applications and approved by the Court. Furthermore the failure of a party to object to a monthly invoice does not waive that party's right to object to any interim or final fee application.

These types of compensation orders are often sought in large reorganizations. Their use, however, is not uniformly accepted and when they are granted, their terms vary. In *In re Kaiser Steel Corporation*, 74 B.R. 885, 892–93 (Bankr.D.Colo. 1987), Judge Matheson issued what apparently is the first published decision dealing with these types of compensation procedures. The court adopted a procedure whereby professionals would be paid 75% of their billings on a monthly basis subject to the requirement for periodic interim applications to review such billings and amounts paid. The court did not specifically address its authority for such order, referring instead to the absence of its prohibition in the express language of the Bankruptcy Code, and to the policy of attracting qualified counsel to bankruptcy.

In the Court's view, Section 331 does not prohibit the adoption of such procedure as long as it is clear that the monthly payments made are subject to recapture from the professionals at the time the interim applications are filed with the Court for the Court's approval. In cases of the magnitude of the Kaiser proceedings, the billings for professional fees and expenses incurred in travel and in providing services will be substantial. Following the normal practices under Section 331 effectively requires counsel to defer payment for close to six months when time is allowed to prepare and submit fee applications, give the neces-

sary notices and allow the court and creditors to have the opportunity to review the fee applications. Delays of that magnitude are not consistent with normal commercial practices and can have a significant chilling effect on the ability of the Debtor and the Committees to retain counsel and services of a level needed in order to effectively administer the case.

*Id.* at 892. *See also In re Frontier Airlines, Inc.,* 74 B.R. 973 (Bankr.D.Colo. 1987).

In *In re Knudsen Corporation,* 84 B.R. 668 (9th Cir. BAP 1988), the court also approved the use of a fee payment procedure whereby professionals could be paid on a monthly basis without prior court approval of those monthly bills. Acknowledging Judge Matheson's lead in *Frontier Airlines* and *Kaiser,* the *Knudsen* court sought a more specific authorization for such orders and found it in section 328(a).[9] The court saw the payment procedure order as permitting periodic replenishment of the professionals' retainers that is not prohibited under either section 330 or 331 of the Bankruptcy Code.

We agree with the Trustee that allowance and disbursement of fees is permitted only in accordance with sections 330 and 331. We disagree, however, that sections 330 and 331 absolutely prohibit the transfer of funds to professionals prior to compliance with those sections. Section 328(a) specifically states that a bankruptcy court may authorize a re-

tainer as part of a compensation agreement. A retainer contemplates payment of a lump sum at the beginning of a case or periodically thereafter. Periodic retainer payments could be either set amounts or a percentage of fees incurred in prior months. Legal fees and costs may then be deducted from the retainer as they accrue and are allowed by the court. It makes little sense that the court could allow payment of a lump sum or periodic retainer before fees are earned, but not after. The critical factor is that fees must not be finally allowed (i.e., they must be subject to repayment) until a detailed application is filed, an opportunity for objection has been provided, and the court has reviewed the application.

*Id.* at 671. *See also In re Dandy Lion Inns of America,* 120 B.R. 1015, 1018 (D.Neb.1990) (using section 328 as basis for interim payments orders). The *Knudsen* court was further persuaded that notice of and an opportunity to be heard on the approval of a compensation procedure as well as notice of and an opportunity to be heard on the fee applications satisfied what the court described as the "method of implementing the Code's policy". *Knudsen,* 84 B.R. at 672 ("The fee application procedure and the notice and hearing requirement are not policies in themselves; they are a method of implementing the Code's policy of having the bankruptcy court scrutinize attorneys' fees in order to avoid overreaching and waste of

9. Section 328(a) provides:

The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such

terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

the estate's assets."). In addition the court saw nothing to indicate that the proposed procedure would "be used in a discriminatory manner." *Id.* There were ways in which a court could ensure that if disgorgement was warranted, the professional's would have the means to do so. Finally the court, as the prior cases had done, addressed the concerns that qualified professionals might not participate in the bankruptcy process absent these kinds of payment orders. *Id.* ("[W]hen counsel must wait an extended period for payment, counsel is essentially compelled to finance the reorganization. This result is improper and may discourage qualified professionals from participating in the bankruptcy cases; a result that is clearly contrary to Congressional intent.") (citations omitted).

Although the language in *Knudsen* is somewhat contradictory [i.e., "legal fees may then be deducted from the retainer as they *accrue and are allowed*" and "fees must not be finally allowed (i.e., they must be subject to repayment) until a detailed application is filed, an opportunity for objection has been provided, and the court has reviewed the application"], the decision is clear that in "rare" cases it is appropriate to permit evergreen retainers which professionals could draw down prior to approval of fee applications.[10] The *Knudsen* court adopted a four-part test to determine when such a rare case existed:

1. The case is an unusually large one in which an exceptionally large amount of fees accrue every month;

2. The court is convinced that waiting all extended period for payment would place an undue hardship on counsel;

3. The court is satisfied that counsel can respond to any reassessment in one or more of the ways listed above;

4. The fee retainer procedure is, itself, the subject of a noticed hearing prior to any payment thereunder.

*Id.* at 672. The court proposed a number of ways in which the third prong, the reassessment of fees, could be met.

The ability to recover fees may be assured by a variety of methods, including, without limitation, the following: retainer payments are for only a percentage of the amount billed so that the likelihood or necessity of repayment is minimal; counsel can post a bond covering any possible reassessment; counsel's financial position makes it certain that any reassessment can be repaid; funds paid prior to allowance are held in a trust account until a final or interim fee allowance is made.

*Id.*

In *In re Mariner Post–Acute Network, Inc.*, 257 B.R. 723, 731 (Bankr.D.Del.2000), the court agreed with the *Knudsen* analysis but refused to limit instances where interim compensation procedures should be adopted to only those cases meeting the four-part *Knudsen* test. The court noted that other factors were relevant to a determination of whether an interim compensation procedure is appropriate. Those factors include "whether other fee arrangements would impose a hardship on the debtor", "the effect of the proposed procedure on the ability of the Court to adequately review professional fee applications", "the payment arrangement's economic impact on the ability of the debtor's ongoing business operation, the ability of the debtor to reorganize, or the reputation of debtor's counsel." *Id.* at 731. To en-

---

10. There is no doubt that security retainers, the most common form of retainer employed in bankruptcy, remain property of the estate and cannot be drawn upon absent court authorization. *See In re Tundra Corporation,* 243 B.R. 575, 582–83 (Bankr.D.Mass.2000).

sure that fees could be repaid if they were subsequently disallowed, the court held that a professional could not receive more than 80% of fees unless he posted a bond or placed the fees received into a trust account pending approval of the final, or even interim, application by the court.

Not all courts have looked favorably upon interim compensation procedures, however, nor have all agreed that such orders are within the court's power. In *In re Maxton Meat Processors Corporation*, 2000 WL 33673797 (Bankr.M.D.N.C.2000), the court employed the *Knudsen* factors to permit applications for interim compensation to be filed monthly; it refused, however, to allow payment of those monthly applications "without notice and an opportunity to be heard with respect to each interim application." *Id.* at *1. *See also In re Commercial Financial Services, Inc.*, 231 B.R. 351, 355 (Bankr.D.Okla.1999) ("Neither Section 330 or 331 provides authority for the outright payment of professional fees prior to at least interim scrutiny by the Court. The legislative history of Section 331 made clear that the '*only* effect of this section is to remove any doubt that officers of the estate may *apply for*, and the court may *approve*, compensation and reimbursement during the case, instead of being required to wait until the end of the case.'") (quoting H.R.Rep. 595, 95th Cong., 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6287 (emphasis added)); *In re Genlime Group, L.P.*, 167 B.R. 453, 454 (Bankr.N.D.Ohio 1994) ("The court cannot agree with the court in *In re Knudsen Corp.* that the language of § 328, which provides for the

employment of professionals 'on any reasonable terms and conditions of employment', permits a court to ignore the unambiguous language of § 331 which requires 'notice and a hearing' preceding disbursements to professionals.").

This Court agrees with the *Kaiser, Knudsen,* and *Mariner* courts; the establishment of compensation procedures permitting professionals to receive payment in advance of court review is appropriate in certain cases, especially those in which the secured creditor permits its cash collateral to be used to pay the administrative expenses or the post-petition lender includes such a provision in the debtor-in-possession financing agreements. As in *Knudsen*, the instant cases are "essentially a controlled liquidation for the benefit of a secured creditor." *Knudsen*, 84 B.R. at 671. If a secured creditor is willing to finance a case in the hope that its recovery will be improved by the reorganization, there is no reason to delay the payment of a debtor's or committee's professionals until interim or final fee applications are approved. Section 331 does not prohibit the implementation of such procedure and section 328(a), although not specifically addressing the issue, contains language which supports orders of the type entered in these cases. Whether viewed as the periodic replenishment of a professional's retainer under section 328(a)[11] or the use of cash collateral to pay the invoices pursuant to section 506(c),[12] these orders are permissible and in their absence Congress' desire to attract qualified professionals to the bankruptcy arena by attempting to

---

**11.** The Court need not address whether section 328(a) implicates a different standard for reviewing fee applications. The orders in this case have been clear; fees and expenses will be reviewed under the "reasonable and necessary" standard of Section 330.

**12.** Section 506(c) provides:

The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

equalize the economic treatment of bankruptcy professionals with their colleagues who provide comparable services in other areas would be thwarted. *See* H.R.Rep. 595, 95th Cong., 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6286–87. An order that requires the professionals to seek court approval of their compensation, even if the compensation has already been paid, especially when the motion requesting the establishment procedure is itself served on interested parties, comports with the requirements for notice and a hearing.[13] Moreover permitting professionals to be paid on a monthly basis and provide the Court, the United States Trustee, and other parties in interest with a running account of the amounts paid to professionals prevents undue surprises; in cases where there are unencumbered assets, a creditors' committee can keep close watch and hopefully take swift action to avoid later finding that there will be no distribution to its constituents as a case has become administratively insolvent. *Mariner,* 257 B.R. at 728. In cases such as the instant cases, the summaries alerted the Court to a possible need to caution professionals about their fees and led to the order that fee applications be filed.

## INTERIM FEE AWARDS UNDER SECTION 331

■ Section 331 provides

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

Courts and commentators have held that awards of interim fees under Section 331 of the Bankruptcy Code are governed by the same standard as set forth in section 330. *Friedman v. Melp (In re Melp),* 179 B.R. 636, 640 (E.D.Mo.1995), *aff'd* 117 F.3d 1422, 1997 WL 401191 (8th Cir.1997) (unpublished table opinion) citing *In re Minton Group, Inc.* 33 B.R. 38, 41 (Bankr. S.D.N.Y.1983); COLLIER ¶ 331.03[1]. "The standard for fee allowances in this circuit is the lodestar approach ... which expands upon the criteria, of Bankruptcy Code § 330(a)(1). It requires the court to determine a reasonable hourly rate and apply it to the time reasonably expended, and then perhaps adjust it by various factors." *Bank of New England,* 134 B.R. at 453 (citations omitted). "To determine the number of hours 'reasonably' spent, as well as in setting a 'reasonable' hourly rate, a court must review the work to see whether 'counsel substantially exceeded the bounds of reasonable effort' ... and should disallow hours that were 'duplicative, unproductive, excessive, or otherwise unneces-

---

**13.** The phrase "after notice and a hearing" is subject to rules of construction contained in section 102 of the Bankruptcy Code. Section 102 provides:

In this title—
(1) "after notice and a hearing", or a similar phrase—
(A) means after such notice as is appropriate in the particular circumstances, and

such opportunity for a hearing as is appropriate in the particular circumstances; but (B) authorizes an act without an actual hearing if such notice is given properly and if—

(i) such a hearing is not requested timely by a party in interest....

sary.'" *Boston & Maine Corp. v. Moore,* 776 F.2d 2, 7 (1st Cir.1985) (citations omitted) (decided under the Bankruptcy Act of 1898).

With further reference to reasonable hourly rates, it is well-settled that different hourly rates are appropriate when the same attorney performs different kinds of work. *See Copeland v. Marshall,* 641 F.2d 880, 892 (D.C.Cir.1980); *Furtado v. Bishop,* 635 F.2d 915, 920–21 (1st Cir.1980). In view of the caution expressed in *Miles v. Sampson,* 675 F.2d 5 (1st Cir.1982), that rates not be graded "in an overly refined manner," *id.* at 9, the relatively broad classifications in *Brewster v. Dukakis,* 3 F.3d 488, 492 n. 4 (1st Cir.1993), distinguishing between "core" and "non-core" services [which terms are not given the same meaning as in 28 U.S.C. § 157] seem preferable, as follows: Core work includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring and implementation of court orders. Non-core work consists of less demanding tasks, including letter writing and telephone conversations. In addition, non-core services also include attendance at court hearings in a non-participatory capacity and conferences with co-counsel.

*McLaughlin v. Boston School Committee,* 976 F.Supp. 53, 63 (D.Mass.1997) (citations omitted).

Despite the consensus that interim fee awards invoke the reasonable and necessary standard, there have been varied approaches in awarding interim fees. Because the results of a case are often unknown until near the conclusion of the case, some courts have employed the "hold-back" approach, at least with respect to large cases. *See Bank of New England,* 134 B.R. at 459–60 (stating that the average hold-back appears to be 25%). In *In re Public Service Company of New Hampshire,* 93 B.R. 823, 834 (Bankr.D.N.H.1988), cited by Judge Hillman in the *Bank of New England* decision, the court articulated that interim fee awards would be judged against a "general reasonableness" standard as the case was often not in such a posture as would allow the court to undertake a meaningful analysis of the benefits achieved versus the fees incurred. Although some courts have held that 100% of reasonable, interim fees should be allowed where the court is "merely ... satisfied that a sufficient balance will remain outstanding to assure the possibility of an offset for any amount which is not finally allowable". *In re City Mattress,* 174 B.R. 23, 27 (Bankr.W.D.N.Y.1994), others have denied interim fees where the posture of the case made it difficult to determine the value of the services to the estate and the court anticipated that the case would be completed in less than a year. *In re General Coffee Corp.,* 39 B.R. 7, 8 (Bankr.S.D.Fla.1984). In *In re Rocky Mountain Helicopters, Inc.,* 186 B.R. 270, 272 (Bankr.D.Utah 1995), the court authorized payment of 50% of the fees and 100% of the expenses without the need to file interim applications while in *Commercial Financial Services,* the court held that "[n]either Section 330 nor 331 provides authority for the outright payment of professional fees prior to at least interim scrutiny by the Court." *Commercial Financial Services,* 231 B.R. at 355.

There are a number of professionals involved in these cases: the results of many of their efforts have become clearer since the recent hearing on the Debtors' motion to sell substantially all of their assets. As these results further crystallize, the Court may need to adjust the interim awards that the Court is entering on the fee appli-

cations. The basic principles that guide the Court in its review of and ruling on interim and final applications will not change, however. Those are set forth below.

## FORM OF FEE APPLICATION

■ Massachusetts Local Bankruptcy Rule 2016–1 and Appendices 6 and 7 thereto guide an applicant in preparing his request for fees and expenses. The requirements, while imposing more stringent requirements for both the presentation and content than a professional would usually have in billing nonbankruptcy clients, are not so onerous that professionals cannot readily comply. Those professionals who failed to comply were given another opportunity to correct the deficiencies. Fee applications in bankruptcy are nothing new, however; nor are the requirements for such applications newly imposed. *See, e.g. In re WHET, Inc.*, 58 B.R. 278, 281–82 (Bankr.D.Mass.1986) (discussing and amplifying the requirements of Rule 32 of the Massachusetts Rules of Bankruptcy which had become effective on February 1, 1986, less than one month before the *WHET* decision). In the future the Court expects that all professionals seeking compensation from a bankruptcy estate will comply with the requirements without the need for a "do-over". Fees and expenses incurred to correct a non-conforming application cannot be charged to the estate.

## Categories

■ As Judge Lavien recognized in *WHET,* computerized time records without more, especially with cases becoming larger and more complex, are often mean-

ingless, hence the development of the requirement that fee applications seeking over $35,000 in fees or those that are lengthy be broken down into categories with each category describing a specific task or group of related tasks. Federal Rule Bankruptcy Procedure 2016 provides a general description of what must be contained in a fee application. Massachusetts Local Bankruptcy Rule 2016–1 provides a more detailed description of the form and substance of a fee application, including special requirements for applications seeking more than $35,000.[14] Finally the United States Trustee Guidelines For Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (the "Guidelines")[15] set forth recommendations similar to the requirements of MLBR 2016–1. In addition the Guidelines contain two lists of categories (one for attorneys and one for accountants) that, while not inclusive of all tasks that professionals may have to undertake in a given case, provide some uniformity in the classification of common tasks and attempt to carve into separate categories some of the tasks that professionals, especially attorneys, place in the category of "case administration". Although many of the professionals made reference to the Guidelines in their employment applications, very few actually used the categories prescribed in those Guidelines. In the future, the Court urges all professionals to use those categories, in addition to whatever other categories they may need to create. This uniformity will assist the Court in reviewing applications for duplication of services, especially as in this

---

14. Massachusetts Local Bankruptcy Rules, including samples of a summary fee chart and narrative descriptions set forth in Appendices 6 and 7, are available on the Internet at *http: www.mab.uscourts.gov/pdfdocuments LR2002.pdf.*

15. The Guidelines are reprinted in 28 C.F.R. Part 58. Appendix and are also available on the Internet at *http: www.usdoj.gov/ust/fee0206.htm.*

case, where there are numerous special counsel, and hopefully put an end to the large "catch-all" categories such as "general bankruptcy matters" and "case administration". Although the Guidelines have two categories, specifically "business operations" and "case administration", that counsel could misuse, the descriptions of what is included in those categories indicate they are not intended to be catch-all classes.[16] In some cases it may be necessary to create new categories or subcategories. For example if counsel devotes substantial time to employee issues, that work should be segregated from "business operations" and put into its own category or subcategory.

Early in these cases the Court expressed its concern for the number of professionals, including special counsel. It admonished the professionals that it expected that they would standardize the categories in their fee applications to the extent possible. It was the Court's intent that all of a party's attorneys, be they special counsel, local counsel or general bankruptcy counsel, would use the same categories. To the extent possible other professionals, including financial advisors and accountants, should use these same categories or at least those same categories where the professionals are working on the same tasks as the attorneys. For example, if both counsel and accountant are reviewing claims, both fee applications should have a "claims review" category. If the accountant's work in this category focused primarily on preparing a preference analysis while counsel's work focused on identifying claims to which objections will be filed, the narrative should indicate the

different or overlapping work. Most of the professionals ignored this admonition. Requiring professionals to follow the Guidelines' categories will alleviate, if not eliminate, this problem. Moreover, if professionals adhere to the categories in the Guidelines, the standardization will occur without the need for the professionals to expend a great deal of time discussing what categories they will use. Therefore, in the future, this Court shall require that professionals adhere to the categories delineated in the Guidelines.

### Narrative Descriptions

■ Massachusetts Local Bankruptcy Rule 2016–1 not only addresses when narrative sections are required (i.e. "fee applications seeking more than $35,000 in compensation, or are otherwise very lengthy"), but also what must be included in the narratives. Among other things the narrative "must describe the task **and the benefit to the estate** . . . ." Some professionals failed to address the latter requirement or if they did, gave only the most cursory treatment to explanations of benefits to the estate. A narrative of the type contemplated by MLBR 2016–1 is not only very helpful to the Court but should help to protect the professionals from reductions in fees that result from the inability to discern how the services benefitted the estate. As is discussed below, a benefit to the estate is the essence of the "reasonable and necessary" standard which the Court must apply. Although the Court does not wish to encourage a proliferation of meaningless and self-aggrandizing prose, it is the responsibility of the professional seeking payment to clearly and concisely de-

16. "Business operations" includes "issues related to debtor-in-possession operating in chapter 11 such as employee, vendor, tenant issues and other similar problems." "Case administration" includes "coordination and compliance activities, including preparation of statement of financial affairs; schedules; lists of contracts; United States Trustee interim statements and operating reports: contacts with the United States Trustee: general creditor inquiries."

scribe what was done, why it was done, and how the outcome benefitted the estate. If the outcome was not as anticipated, the professional should explain what went awry and when it became clear to the professional that the work would not produce the desired result.[17]

### Time Records

 The Court expects that time records will conform to the local rules and Guidelines. Professionals who lump time together or have woefully inadequate descriptions, such as "research", "work in motion", "telephone calls to counsel for creditor", do so at their peril. No Court should be expected to intuit the benefit of such work to the estate. Again, because fee applications are not a new invention, professionals in charge of bankruptcy engagement know what is expected of them and their colleagues. It is incumbent on those professionals to ensure that everyone in his firm knows how to keep their time entries.

FTI Policano & Manzo ("Policano"), financial advisor to the Lenders, originally filed its application with time records so devoid of detail as to be useless to the Court. In amending its application, the firm produced somewhat better, but still troubling, entries. For example in the category of "Operational Issues", there are 28 separate time entries that are identical and read "Analysis of various motions filed including operational analysis, cost/benefit analysis to the estate, and communication with Company and other financial advisors." The entries range from a low of 1.3 hours devoted by Mr. Dannenburg to this task on January 7, 2002 to a high of 15.00 billed to this description by Mr. Straub on January 16, 2002. Between January 2, 2002 and February 8, 2002, Messrs.. Straub and Dannenburg billed over $61,000 of time using only this one description.

Policano was originally retained by the Lenders' attorneys, and represented that it kept its time in accordance with its general practices, in part because it did not anticipate having to file fee applications. Although the Court recognizes that there is some validity to this explanation, retention by the Lenders' counsel does not justify ignoring the requirements that become operational when services are rendered to any party who intends to seek compensation from estate assets. Further, if there was any doubt about the need for the "Lenders" professionals to submit fee applications, the Modification to the Interim Compensation Order removed the uncertainty. Moreover, in these cases there is a question whether the prepetition

---

**17.** Contemporaneously with this decision, the Court has issued a decision on interim fee applications in *In re Malden Mills Industries, Inc.,* 281 B.R. 493 (Bankr.D.Mass.2002) (jointly administered) and intends the comments herein to be applicable to both decisions. One point of note, in the *Malden Mills* decision the Court commended the attorneys from Foley Hoag LLP, counsel to the creditors' committee in those cases, for the narratives submitted in connection with its fee application and recommends such narratives as examples of descriptions that briefly but clearly set forth the information the Court looks to when reviewing fee applications.

For example, in analyzing the claims asserted by Malden Mills' prepetition lenders, counsel did not simply state that it reviewed numerous documents and drafted a complaint. Instead the narrative describes, with some specificity, the documents reviewed, the level of staff employed in retrieving the documents, the efforts taken to minimize the fees and expenses incurred in undertaking the review, the legal issues identified as a result of the work, and follow-up steps that may benefit the estate. Without such detail, it would have been much more difficult for the Court to evaluate the reasonableness of the almost 350 hours spent performing services in this category.

lenders are secured and if they are, there is little doubt that they are undersecured. The Court itself, very early in these proceedings, raised the issue that it is likely that the work performed by the Lenders' professionals on behalf of the prepetition creditors is not reimbursable by the estates. In the future the Court expects that any party or any professional who will seek compensation from estate assets will submit a conforming fee application.

### Duplication of Effort

Duplication of effort has arisen primarily in three ways: (i) professionals within the same firm attending to the same task or part of the same task such as multiple attorneys attending the same court hearings, numerous personnel participating in intra-office conferences, and review of work done by other professionals within the same firm; (ii) local and out of state counsel attending to the same tasks, including attending the same hearings; and (iii) special and general counsel attending to the same task. The first two have been addressed in numerous decisions and again, professionals are urged to review Judge Hillman's decision in *Bank of New England*. When it is necessary for more than one professional from the same firm or when both local and out of town professionals attend to the same task, the professionals should address this duplication and proffer an explanation. On more than one occasion the Court has been left to wonder why two, or even three or more, professionals representing the same constituency have been present at hearings, especially when so many of the attendees had no evident roles.

The third area of duplication has presented a particular problem in these cases before the Court. Early in the cases, the Debtors sought, and subsequently obtained, permission to retain Testa, Hurwitz & Thibeault, LLP ("Testa") as special counsel. Testa had been counsel to the Debtors for ten years prior to the bankruptcies and "represented and advised the Debtor on all corporate and securities matters, mergers and acquisitions, business affairs, operations, labor and employment matters, environmental matters, real estate transactions, intellectual property and litigation." In addition the firm represented the Debtors in negotiating the postpetition financing. Testa, however, is not "disinterested" within the meaning of the Bankruptcy Code and therefore is disabled from acting as bankruptcy counsel. At the hearing on the application to employ Testa, the Court cautioned the attorneys from Testa that their engagement was limited to that of special counsel. Testa attorneys, however, billed a substantial amount of time to bankruptcy matters. That time is not compensable and the Court cautions special counsel who become involved in the management of the bankruptcy cases, rather than confine their involvement to the matters for which they were retained, that they put their fees at risk. The Court will not permit special counsel to circumvent the requirements for employment set forth in the Bankruptcy Code.

### Non-billable Time

In seeking payment of fees, professionals should be guided by the general principle that time for which they do not bill their non-bankruptcy clients should not be included in a fee application. Thus time spent attending pre-engagement meetings and participating in the so-called "beauty contests" vying for employment should not be included in the application. In addition time spent to perform conflicts checks and/or to obtain necessary waivers cannot be billed to the estate.

This Court agrees with Judge Hillman's view, expressed in *Bank of New*

*England,* 134 B.R. at 455, that the time spent by certain types of individuals should ordinarily not be included in a fee application. This includes time spent by non-paid interns, summer associates, and staff whose salaries can ordinarily be viewed as part of a firm's overhead compensated via the rates of the firm's professionals and paraprofessionals.

### Preparation of Fee Applications

 The Court recognizes that the time spent preparing a fee application is generally greater than the time spent to prepare a bill for a nonbankruptcy client. Because of that, time spent preparing fee applications is compensable. *But see In re Junco, Inc.,* 185 B.R. 215, 222 (Bankr. E.D.Va.1995) ("[T]ime spent preparing and presenting a professional's fee application is a cost of doing business rather than a compensable service rendered for the debtor."). But the time spent must be reasonable. By now professionals who routinely practice before bankruptcy courts should be well versed in the requirements for time keeping and should have tailored both their individual time-keeping practices and their computer billing systems accordingly. As a result a professional should not have to expend time to "rearrange" time entries into separate categories or to fix other time-keeping problems such as "lumping" of time or the supplementation of inadequate entries. The preparation of a fee application should be primarily a ministerial task. Although the professional needs to write the narratives, he should not expect compensation from the estate if he also undertakes the production of summary charts and biographies. While the Court expects each professional in charge of billing to review the time records and review their own fee requests for reasonableness, only a brief review should be necessary. If a professional must review each time entry, line by line, to ensure its accuracy and that it was correctly billed to the correct client or matter, the estate should not have to bear this cost any more than a nonbankruptcy client would expect to pay for the time his attorney or accountant must spend to ensure that he receives an accurate bill.

In the past this Court usually awarded compensation for 50% of the time spent for preparing fee applications because the Court found that generally many professionals spent an inordinate amount of time preparing fee applications and often had professionals or paraprofessionals doing billing tasks that could more appropriately be classified as clerical. Some courts achieve this result via a downward adjustment of the rates charged for the preparation of a fee application. "The task of organizing facts or researching and presenting legal arguments has to be more demanding than documenting what a lawyer did and why he or she did it." *Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983).

 Another approach would be to limit compensation in this category to a percentage of the overall fee application. *In re Bass,* 227 B.R. 103, 109 (Bankr. E.D.Mich.1998) (compensation limited to 5%); *In re Spanjer Bros., Inc.,* 203 B.R. 85, 93 (Bankr.N.D.Ill.1996) (compensation limited to 5%). *See also In re Economy Lodging Systems, Inc.,* 1999 WL 714099 (Bankr.N.D.Ohio 1999) (3% cap imposed by the 6th Circuit in fee shifting cases applicable to preparation of bankruptcy fee application). The application of an arbitrary cap, however, may not adequately compensate those applicants whose fees are modest. For example a $500 limit to prepare a $10,000 may be insufficient. At the other end of the spectrum, awarding 5% of the total fees for preparation of a fee application may result in a windfall to

the applicant. Fifty thousand dollars to prepare even a $1 million application is probably excessive. Therefore, in lieu of establishing a set percent of overall fees as the only yardstick by which time spent to prepare the fee application should be measured, in most cases the Court will continue to apply a 50% reduction for fees incurred in preparing fee applications until the Court is satisfied that professionals have conformed their time-keeping practices in such a way the vast majority of fees incurred to prepare applications result from only the additional requirements, namely the preparation of narratives and charts, necessitated by the fact that the "bill" will be presented to a bankruptcy court.

### Travel Time

 This Court often questions professionals concerning their policies for billing travel time and found that how professionals treat travel time ranges from not billing the time to billing it at the full hourly rate and includes the compromise position of billing the time at a reduced, often by half, rate. Mindful that different tasks may warrant different rates, the Court considered a standard percentage reduction for travel time but instead adopts Judge Hillman's pronouncements set forth in *Bank of New England* and will reimburse travel time at the usual hourly rate provided both the time and rate are reasonable. "The Court may indulge a debtor, trustee, or committee desiring to retain professionals from outside the district in a case which could be handled by local persons, but, generally speaking, it will not permit fees to be paid from the estate for travel time greater than those which would be incurred if the professional's office were within the district." *Bank of New England*, 134 B.R. at 454 (footnote omitted). This is especially true when local counsel has been retained and is competent to attend to most of the business. An estate should not have to bear the cost of travel for a professional from outside the district to attend a routine hearing when local counsel has been engaged. As discussed in the following section, utilization of local professionals can often produce cost savings for the estate and the failure to use local counsel can, in some instances, justify a reduction in fees awarded.

### Local Versus Out of State Professionals

 The Supreme Court has held that the lodestar must be calculated according to "the prevailing local rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). As Judge Kenner recognized in *In re LearningSmith, Inc.*, 247 B.R. 581, 582 (Bankr.D.Mass.2000), "the Court should apply the rate customarily charged for similar services in the locality and should depart from the local rate only when the case required expertise not locally available." Given the rise in professionals' rates, however, there has generally not been a great disparity between the rates of local counsel or other professionals, or at least those from large Boston firms, and those from outside the jurisdiction.[18] The Court notes that the

---

**18.** A comparison of the rates charged by the Boston-based attorneys at Mintz Levin and those charged by the New York-based attorneys of Morgan Lewis indicate that in some instances Mintz attorneys with comparable experience to their Morgan counterparts actually are billed at higher rates. For example Mintz billed the time of Attorney Deena Ethridge, who became a member of the bar in 1998, at $305 per hour and subsequently increased her hourly rate to $330; Morgan billed the time of Leana Nussbaum, a 1998 law school graduate, at $245 and then $280 per hour. Attorney Dan Bleck, of counsel to

rates of the New York and Boston attorneys exceed those charged by the attorneys at Bowditch & Dewey, a prominent Worcester firm that serves as local counsel to the agent for the Lenders. The Court, however, does not believe this disparity alone mandates a reduction for out-of-town rates but rather highlights the great cost savings that can be achieved through the prudent use of competent local counsel. Out of town professionals, whether they are located in Boston, New York, or elsewhere, have a responsibility to investigate whether the use of local counsel for some tasks would benefit the estate and, if so, to seek engagement of local professionals.

The one glaring exception to this uniformity of rates is in the area of financial advisors in this case. Zolfo Cooper, LLC ("Zolfo") bills at hourly rates that range from $475 to $625 for principals and managers prior to January 1, 2002 and $500 to $675 thereafter, and $150 to $475 for professional staff prior to January 1, 2002 and $225 to $495 thereafter. In addition the firm charges separately for tasks and charges ordinarily included in overhead. For example, if Zolfo had a file copied, not only does it seek reimbursement for the per page cost of reproducing the document, it also seeks reimbursement for the time spent by the individual who actually made the copies. The rates for such clerical staff range from $75 to $200: the rate structure for these employees has not changed during the course of this case. In his affidavit in support of the application to employ Zolfo Cooper, Stephen F. Cooper,

a principal of the firm, represented that "[s]o as not to burden clients who do not require such services, ZC does not include support services in the firm's overhead for the purpose of establishing the billing rates. Billing rates are generally representative of the prevailing market rates, as awarded by other Courts in similar circumstances...." Yet during the hearing on the firm's fee application, the firm's representative acknowledged that the firm set its rates based upon what other like firms charged for fees without knowing whether those so-called comparable rates included the type of overhead charges for which Zolfo sought additional compensation. The Court finds this approach could be classified simply as "what the market will bear" and questions whether it is an appropriate test for determining the reasonableness of rates.

It is impossible to discern whether this support services such as photocopying occurred at Zolfo's offices, in which case it is unlikely that the Debtors or any client would have input into whether they or Zolfo should do this work, or at the Debtors' place of business, where presumably the Debtors' own employees could accomplish these tasks. More importantly, given the rate structure of the non-support staff of Zolfo, it is unreasonable to expect compensation for these additional fees which other firms include in their overhead.

With the exception of the firm's name, Policano uses the identical language quoted above. The hourly rates of the professionals billing time to these matters

---

Mintz, has been a member of the Massachusetts bar since 1992 and has an hourly billing rate of $375: Bennett Gross and Jay Teitlebaum, both of counsel to Morgan and 1978 and 1985 law school graduates, respectively, had billing rates of $375 and $370, respectively, with both billing rates increased to $390 in 2002. Attorney Richard Mikels, counsel to the Debtors, has 30 years experience as an

attorney and currently charges $500 per hour. Attorney Richard Toder, counsel to the agent for the Lenders, has over 35 years experience in insolvency and restructuring; although his hourly rate of $595 is the most expensive, his knowledge and experience in general, and his contribution to these cases in particular, support this rate.

ranged from $280 to $575 with the vast majority of the work performed by two individuals whose hourly rates are $405 and $475. Its blended hourly rate is $411.52. The Court finds this blended rate excessive in comparison to what financial advisors performing the same type of quality services charge. For example PricewaterhouseCoopers LLC ("PWC") has a blended hourly rate of $344.44, and not only did not charge for time of clerical staff performing ministerial tasks, but also did not seek reimbursement of any expenses except for less than $1,000 for travel reimbursement.

### Bonuses

 Some of the applicants sought bonuses in connection with their employment. Such requests were, and remain, premature. Consequently the Court refused to authorize them. Applicants are free to seek enhancements at the end of a case if they believe their services warrant. Applicants seeking such enhancements, however, must demonstrate a sufficient basis for such requests. Merely doing a good job is not enough. *City of Burlington v. Dague*, 505 U.S. 557, 565, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992) (generally disapproving of contingency enhancements under federal fee-shifting statutes); *In re Boston and Maine Corporation v. Sheehan, Phinney, Bass & Green, P.A.*, 778 F.2d 890 (1st Cir.1985) (fee applicant's burden to justify enhancement very high; absent compelling circumstances enhancement not justified). "[C]ompensation awards under § 330 may be enhanced only in exceptional circumstances where the applicant produces specific evidence that an award based on his standard hourly rate and actual hours worked does not fairly

compensate for the work done...." *In re Manoa Finance Company, Inc.*, 853 F.2d 687, 688 (9th Cir.1988). *See also Lipsett v. Blanco*, 975 F.2d 934, 942 (1st Cir.1992.)

### Expenses

 Expenses, like fees, must be reasonable and necessary. While generally professionals have come to understand what types of expenses are reimbursable and to what extent, there are some areas of concern that have arisen as a product of our times. First, in this day of instant transmission of information, professionals must resist the temptation to send every document by telecopier or messenger service. The Court recognizes and applauds the efforts of counsel to minimize such expenses. The Court notes that, on occasion, the Debtors' counsel have emailed documents and pleadings to the Lenders' Worcester counsel for delivery to the Court and the professionals have noted in Court that they received pleadings or drafts of pleadings via email. The Court encourages attorneys to agree to accept service by email and will accept as served, any pleading which the serving party indicates on his certificate of service was served electronically on a party consenting to this method of service. By now professionals are well-trained in the use of electronic delivery of documents and understand how to receive electronic acknowledgment of the delivery of documents so served.[19]

 Another area of concern stems from the increased use of professionals from outside the district. This Court agrees that a party's choice of profession-

---

19. If professionals are still unfamiliar with these processes, the Court urges them to consider learning. Within the next year, the bankruptcy courts in this district will be included in the Case Management/Electronic Case Filing System ("CM/ECF"). Those professionals who practice in other jurisdictions that already use CM/ECF are familiar with the process and hopefully appreciate the many benefits of this system.

als ordinarily is entitled to deference but the use of financial advisors from outside this area generates substantial expense for an estate. Personnel must be housed in temporary quarters as those individuals are often present at the Debtors' place of business on a full-time basis. Such staff do not, and should not, live in luxury accommodations; they cannot charge for their groceries. Whether they are at home or at a "home away from home", the estate should not be burdened with what amounts to the ordinary costs of living. Whether the estate should be responsible for other costs, such as car rental, incurred as a result of the temporary relocation will be decided on a case by case basis. When professionals do rent or lease cars, they must keep both the number of cars and the rental expenses of each to a minimum.

Each application for employment of professionals who will be seeking relocation expenses should address how the firm proposes to handle all of the relocation expenses. Relocated professionals should address these costs in their fee applications and specifically note whether the expenses differ from what was anticipated in the employment application, including any additional efforts to minimize these expenses.

## FEE APPLICATIONS

The Court has allowed each of the applications, on an interim basis, without adjustment at this point in the proceedings. Now that the purported need for the parties to focus on the sale of the business rather than filing objections to compensation has been met, the Court intends to review and adjust as necessary the interim awards after the parties provide some indi-

cation of the benefit of their work to the unsecured creditors and, equally as important, after the parties review and comment upon all of the compensation sought. The Court, however, has some specific concerns which the professionals may wish to address in their next or final applications to assist the Court in determining final awards. The primary concerns are noted below.

### The Debtors' Professionals

#### Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

■ Mintz, Debtors' bankruptcy counsel, seeks fees of $622,191 and expenses of $46,367.95. Mintz, like many other firms, often sent two or more attorneys to hearings in this case. The Court often noted the number of the attorneys in attendance and their roles during hearings, and observed that from time to time some of the Mintz attorneys in attendance played little or no substantive role in the proceedings. Such duplication calls for a reduction in fees.

■ In addition to the duplication of effort among Mintz's attorneys, services provided in some major categories substantially overlapped with work performed by other professionals. First, Mintz has requested $54,057 for services rendered in connection with the Debtors' equipment leases. Zolfo has billed $75,335 to "Site Operations and Leases" and $4,987.50 to "Executory Contracts".[20] For the descriptions provided by both firms it is difficult to discern the need for both to have spent so much time on these tasks, especially when the Debtors did not file a motion to reject the leases until after the time period covered by the fee applications.[21]

---

**20.** Testa attorneys spent a small amount of time on this matter.

**21.** When the Debtors did file their motion, they sought to reject all of their equipment leases, even the ones they acknowledged were necessary to their operations. After the rejec-

Second, Mintz personnel billed $38,260.50 for employment of professionals. While there are numerous professionals employed in these cases,[22] Mintz spent time in connection with Testa's employment. This is troubling because Testa itself billed over $5,500, not including time spent to attend engagement hearings, in preparation of its own application. Both firms should address the overlap and are urged to make whatever reductions are appropriate to correct needless duplication.

Third, some work performed by Mintz overlaps with that performed by Testa, special counsel to the Debtors. For example, Mintz billed $10,922.50 for work on some litigation matters. Testa, however, is special litigation counsel and some of the time billed by Mintz's attorneys fall within the purview of Testa's employment. Attorneys from both firms also billed substantial time related to postpetition financing and each firm is encouraged to review the scope of its employment and if appropriate, adjust their bills.

Because neither Mintz nor the other professionals addressed the duplication in their applications, the Court cannot find that anything more than minimal overlap is reasonable. Because, however, the Court is cognizant that the professionals may well have agreed on a division of labor not apparent from either the narratives or the time records, the professionals should consider addressing the areas of overlap and explain either that there was no duplication or that such duplication was reasonable in light of the circumstances in these cases.

**Testa, Hurwitz & Thibeault, LLP**

Testa, Debtors' special counsel in several areas, seeks fees of $108.812 and expenses of $2,977. A reduction in fees is warranted for three reasons. First, the application to employ Testa sought *nunc pro tunc* engagement. At the hearing it was represented that the fees incurred from the petition date until the filing of the application to employ Testa was $12,000. The Court permitted the *nunc pro tunc* engagement but specifically capped the compensation for this period at $12,000. Testa's application now seeks to recover additional fees incurred during this period. The final award will reflect that fees for this period will be capped at $12,000 and thus the firm may wish to make this adjustment its final application.

■ Second, Testa charged for its conflict checks and waivers. Its position is that it routinely charges clients for this work. Based upon the Court's own experience, it is rare for firms to bill for this work and even rarer for a client to pay. This work is not compensable in bankruptcy any more than the "7% surcharge" which Testa stated it routinely charges all of its clients, but for which it did not seek reimbursement in the instant cases, could be passed on to the estate.

Third, the Court currently anticipates a substantial reduction will be applied to the time spent by the firm on bankruptcy matters. Over $50,000 was spent working on or monitoring the bankruptcy in some fashion. Counsel argued such time was necessary as Testa's bankruptcy attorneys were "running the team", which the Court interprets as referring only to the Testa team, and they had to monitor the bank-

---

tion motion was filed, the debtors entered into several new agreements for some of the leased equipment.

**22.** In addition to the professionals referred to in this opinion, the Debtors were permitted to employ numerous other professionals, some under section 327, others pursuant to section 328.

ruptcy to ensure team members did not work in a vacuum because the work is "so interrelated". There are other ways to ensure communication, however, and because the tasks which special counsel performs should relate to discrete areas, there is simply no need for additional bankruptcy professionals to add yet another layer of expense. If the tasks are so interrelated to the reorganization that special counsel bankruptcy attorneys must be so deeply involved, the Court questions whether special counsel has crossed the boundary into the territory of general bankruptcy counsel, a territory it is forbidden to enter because of its lack of disinterestedness. Moreover, as set forth in the comments regarding the fee request of Mintz, there appears to be substantial duplication of effort in some areas, including the time spent by Testa attorneys on bankruptcy matters.

Despite the entries reflecting instruction of the firm's personnel regarding bankruptcy billing practices, some of Testa's attorneys continue to lump their time. Although many of the time entries describe several different tasks, there is no apportionment of time among the tasks.

### Zolfo, Cooper, LLC

Zolfo, the Debtors' financial consultants who in reality act as the day-to-day management of the company, seeks fees of $679,356.50 and expenses of $71,387.23. Zolfo fees will be reduced because the Court finds its practice of billing for staff performing secretarial or ministerial functions is unreasonable. In addition, the Court advises Zolfo, in future fee applications, to address a nagging concern of this Court, namely, what functions did Zolfo perform that Debtors' management, some of whom received retention bonuses, did not and could not perform. Similarly, Zolfo should offer an explanation of how its services were not duplicative of those performed by other professionals. The Court is especially concerned about potential duplication between Zolfo and Mintz relating to the equipment leases. Again, the Court notes that the time records of both professionals indicate conferences with the Debtors' employees regarding leases thus raising the question of what did the Debtors' personnel not do that necessitated such a large investment of time by the professionals.

In addition, Jonathan Mitchell who prepared Zolfo's fee application, responded to the Court's inquiry about the home away from home accommodations of the Zolfo staff that they typically rented between four or five cars for use because "people arrive at different times on different days from different parts of the country and different schedules." Without a more detailed explanation, the Court cannot find that this level of car rental is reasonable or necessary. .

### The Committee's Professionals

#### Choate, Hall & Stewart

Choate, the Committee's general counsel, seeks fees of $216,836 and expenses of $13,460.23. Choate points out that it took a voluntary reduction of $8,400 for fees because of duplicative work and associate training. It also voluntarily reduced its expenses by $500 to bring its application in line with previous fee decisions in this district. Choate, however, like Testa, billed for its conflict check. That time is not compensable and a reduction will be made in the final application.

#### PricewaterhouseCoopers LLP

PWC seeks fees of $192,542.5 and expenses of $689.43. At this point the Court anticipates that the interim requests will be allowed in full at the final hearing for two overarching reasons. First, with respect to the expenses, the only expenses from which PWC seeks reimbursement re-

late to travel expenses. Second, in reviewing the level of professionals involved, the Court notes that most of the hours billed in this case were logged by the least expensive member of the PWC team at $250 per hour. While least expensive does not always correlate to most efficient, in these cases, PWC's staffing pattern was such that much of the less sophisticated work was done by junior staff. In fact, the three members of the PWC logging the most time were the three individuals with the lowest hourly rates. The more expensive professionals performed minimal supervision and spent the bulk of their time on more complex tasks.

### The Lenders' Professionals

#### Morgan Lewis & Bockius LLP

Morgan, Lewis, counsel to the agent for the Lenders, seeks fees of $371,085.50 and expenses of $14,453.61. Much of the fees relate to discussions and negotiations between the agent and members of the pre and post-petition lender groups. Counsel represented that this work was necessary to hold the lending package together. While the Court does not doubt that this is true, the estate should not have to bear the entire burden given that the time records are not adequate to support an award of all of this time and because, among other reasons, the prepetition lenders are undersecured and thus not entitled to fees under the Bankruptcy Code.[23] In addition, the Court notes that, until the Court admonished the parties for the number of professionals each group had in attendance at each hearing, the Lenders' counsel often had both one or more attorneys from Morgan, Lewis as well as local counsel present.

The Court anticipates that it will make a reduction for this duplication.

#### Bowditch & Dewey, LLP

Bowditch, local counsel for the agent, seeks fees of $68,123.50 and expenses of $7,772.37. Because Bowditch's attorney played no obvious role at some of the hearings also attended by counsel from Morgan, the Court expects that it will be called upon to apportion some reduction attributable to duplication of efforts between local and out of state counsel.

#### FTI Policano & Manzo

 Policano, the Lenders' financial advisor, seeks fees of $366,172.50 and expenses of $18,047.66. Of all the applications, it is the most difficult to review because of the dearth of information. Even after being given the opportunity to comply, the firm still presented a deficient supplement. Its time records lack detail, contain "lumped" entries, and there is no attempt to delineate whether specific tasks were performed primarily for the postpetition creditors, the prepetition creditors, or both groups. Such lack of information mandates a reduction as does the fact that Policano, like Zolfo, has billed the time for staff performing only clerical functions. Given Policano's blended hourly rate of $411.52, billing the time of individuals who perform clerical functions is unreasonable.

## CONCLUSION

Separate orders on the interim applications will issue.

---

**23.** As the prepetition loan documents have not been filed with the Court, the Court expresses no opinion as to whether, if the prepetition lenders were able to establish that they are oversecured, they or the agent are entitled to reimbursement of professional fees, especially fees of the financial advisor, under the language of those documents. The Court defers commenting upon this issue with respect to the postpetition financing in order to give the parties the opportunity to address this question if they chose.