**In re NEW BOSTON COKE CORPORATION,**
Debtor.

No. 02–54983.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Oct. 1, 2003.

amount of $499,774.50 (less a stipulated reduction of $25,000.00) and expenses in the amount of $20,091.49 (less a stipulated reduction of $8.25). The Court has reviewed the filed Fee Applications and the objection to fees filed by the state of Ohio. In light of the arguments presented, the filed pleadings, and the testimony presented, this Court finds that a reduction in fees is warranted.

## I.

### *FACTUAL BACKGROUND*

New Boston Coke was formed to own and operate a coke plant. The coke plant was comprised of coke ovens made of refractory brick and blocks and are used for the carbonization of coal into coke which, in this case, was consumed by an adjacent steel mill. In order for the coke ovens to operate, they must be heated to a temperature of 2300 degrees F and that temperature must be maintained. If the coke ovens are allowed to cool, the refractory brick will crumble and the ovens will be irreversibly damaged.

In April of 2002, the collective bargaining agreement that the Debtor had with the United Steel Workers Union expired and many employees walked off the job. After the walk out, much of the plant's equipment became inoperable. The temperature of the coke ovens was not maintained and the ovens were damaged beyond repair. As a result of New Boston Coke's inability to produce coke, the plant ceased operations. There was no possibility of a business reorganization because the assets needed to produce coke were destroyed.

On June 28, 2002, the New Boston Coke Corporation filed a voluntary petition for relief under Chapter 11 of the Bankruptcy

Salvatore A. Barbatano, Stephen P. Stella, Detroit, MI, Samuel D. Sweet, Ortonville, MI, for debtor.

J. Rick Brown, William K. Shaw, Jr., Portsmouth, OH, Eric I. Frankie, Bruce A. Miller, Julia Caroff Pidgeon, Detroit, MI, Gregory J. Poulos, Jill A. Whitworth, Columbus, OH, James B. Robinson, Cincinnati, OH, for creditor.

Paul J. Randel, Detroit, MI, U.S. Trustee.

### *OPINION REGARDING ATTORNEY FEES AND EXPENSES*

MARCI BETH MCIVOR, Bankruptcy Judge.

Foley & Lardner, as Special Counsel to the Debtor, has requested fees in the

Code. The Debtor's schedules, filed on July 16, 2002, show approximately $8.7 million dollars in assets and $12.8 million dollars in liabilities. The largest assets reported on the schedules were a number of pieces of real property valued, in the aggregate, at $3,398,514.32, an overpayment of environmental emission report fees valued at $565,000.00, air emissions credits valued at $500,000.00, and machinery and equipment valued at over four-million dollars. The secured debts listed on the schedules were an estimated three-million dollar liability to the Pension Benefit Guaranty Corporation (PBGC) and an estimated six-million dollar liability to the Internal Revenue Service. Also listed was $1.7 million dollars of unsecured priority debt and two-million dollars of general unsecured debt.

On July 23, 2002, Foley & Lardner submitted an application for employment as Special Counsel for the Debtor. An order granting the application to employ Foley & Lardner as Special Counsel for the Debtor was subsequently entered.

In late August 2002, Foley & Lardner was retained to represent the Debtor in an environmental action brought against it, prior to the bankruptcy filing, by the state of Ohio. The state of Ohio was suing the Debtor for various environmental violations and was seeking monetary relief in the form of reimbursement of costs of remediation and civil penalties. The state of Ohio also sought injunctive relief requiring clean-up of the contamination and the cessation of further contamination.

On October 29, 2002, the PBGC filed a secured proof of claim in the amount of 14.7 million dollars and the IRS filed a secured proof of claim in the amount of 2.1 million dollars. These debts were secured by all-asset liens. The PBGC holds the senior lien.

On November 20, 2002, Foley & Lardner filed a Motion for Approval of Fee Payment Procedure which set forth a procedure under which Foley & Lardner could submit monthly "Fee Statements" and receive ninety-percent of the fees and one-hundred percent of the expenses it requested in these "Fee Statements", without notice or hearing if there was no objection. On December 10, 2002, the Court entered an Order granting the Motion for Approval of Fee Payment Procedure but required a 20% hold-back on the fees which could be distributed prior to final approval. The Order further required Foley & Lardner to file a fee application after 120 days from the date of the entry of the Order in accordance with 11 U.S.C. § 331.

On December 12, 2002, Foley & Lardner filed a Motion for Order Permitting Surcharge of Professional Fees. Foley & Lardner's Motion requested a $500,000 "carve-out" from the secured claim of the PBGC for the payment of professional fees. The Motion was granted. The "carve-out" allows the first $500,000 received from the sale of estate assets to be set aside for the payment of professional fees.

On December 20, 2002, pursuant to an Order entered by the Scioto County Court of Common Pleas, the Debtor was ordered to: (1) pay a full reimbursement of costs to the Ohio EPA incurred in remediating the site, (2) perform certain environmental clean-up activities associated with the property, (3) cease any further damaging activities, and (4) pay the state of Ohio 2.6 million dollars in civil penalties.

On March 20, 2003, the Debtor submitted its chapter 11 plan, proposing a liquidation. The Plan showed $2.69 million dollars in assets and $78.2 million dollars in liabilities. Those liabilities included the PGBC's $14.7 million dollar secured claim

and the IRS's $2.1 million dollar secured claim.

Also, in March 2003, Foley & Lardner filed it first "Fee Statement". The State of Ohio filed an objection to the Fee Statement. A hearing was held on the State of Ohio's objection on May 6, 2003. At the hearing, the state of Ohio presented a witness in support of its objection to the Fee Statement. That witness was an attorney for the State of Ohio who participated in the prosecution of the Debtor in the Ohio state court litigation. Foley & Lardner cross-examined the witness. At the conclusion of the hearing, the Court ordered Foley & Lardner to file an Interim Fee Application in accordance with the procedures set forth in the Bankruptcy Code and the Local Rules.

On May 28, 2003, Foley & Lardner filed its First Interim Fee Application requesting fees in the amount of $324,372.00 and expenses in the amount of $10,451.47. After Foley & Lardner filed its First Interim Fee Application, the state of Ohio resubmitted its objection to Foley & Lardner's fees. This Court then set this matter for hearing, both on the state of Ohio's objection and on the Court's other concerns which it set forth in its Notice of Hearing. The hearing on the Fee Application was held on July 11, 2003. At the hearing, an attorney from Foley & Lardner stated that, in his best judgment, the sale of the assets would generate five to ten million dollars. Also, at the hearing, Foley & Lardner offered to reduce its fees by $20,000 to $25,000 for time spent representing the Debtor in the state of Ohio litigation. Although Foley & Lardner agreed to forgo compensation for these matters, Foley & Lardner did not concede the merits of the state of Ohio's objection and maintained that it rendered competent counsel to the Debtor before, during, and after the trial. At the conclusion of the

hearing, the Court requested that Foley & Lardner submit any further information in support of its First Interim Fee Application by July 18, 2003. On July 18, 2003 and on July 24, 2003, Foley & Lardner submitted briefs in support of its First Interim Fee Application.

At about the same time as the hearing on the objection to Foley & Lardner's First Interim Fee Application, it came to the Court's attention that the Debtor's plan of reorganization had been withdrawn on June 13, 2003 and no substitute plan had been filed. On July 10, 2003, the Court issued an Order to Show Cause as to why the case should not be dismissed or converted. On July 29, 2003, at the hearing on the Order to Show Cause, the Court dismissed the Debtor's bankruptcy case for failure to file a plan and ordered the professionals to file Final Fee Applications within fourteen days. On August 13, 2003, Foley & Lardner filed a Final Fee Application requesting an additional $175,402.50 for fees and $9,640.02 for expenses, bringing the total fees requested in this case to $499,744.50 (less a stipulated reduction of $25,000.00) and expenses of $20,091.47 (less a stipulated reduction of $8.25).

## II.

### ANALYSIS

A. *Standard for Calculating Fees*

█ In the Sixth Circuit, the lodestar method is used for calculating fees. *In re Boddy*, 950 F.2d 334, 337 (6th Cir.1991). The lodestar amount is calculated by multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended. *Id.* at 337. Bankruptcy Code § 330(a) codifies the criteria for evaluating fee requests. Section 330(a) states, in part:

(1) After notice to the parties in interest and the United States Trustee and a

hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—

(A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional personal employed by any such person; and

(B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

(3) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant facts, including

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—

(i) unnecessary duplication of services; or

(ii) services that were not—

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

\* \* \* \* \* \*

 Pursuant to § 330(a)(2) and case law, a court has the duty to review all fee applications, regardless of whether an objection has been filed, in order to protect the assets of the estate for the benefit of the creditors. *In re Bush,* 131 B.R. 364, 365 (Bankr.W.D.Mich.1991). It is particularly important for courts to evaluate fee applications where there is no incentive for the debtor to limit attorney fees. *In re Copeland,* 154 B.R. 693, 697 (Bankr. W.D.Mich.1993).

 Further, the burden of proof is upon the applicant to justify the requested fees. *In re Hamilton Hardware Co., Inc.,* 11 B.R. 326 (Bankr.E.D.Mich.1981); *Zolfo, Cooper & Co. v. Sunbeam–Oster Company, Inc.,* 50 F.3d 253, 261 (3d Cir.1995)(In evaluating fee applications, "[t]he fee applicant has the burden of proving it has earned the fees it requests, and that the fees are reasonable.") "The Court 'will not indulge in extensive labor and guesswork to justify a fee for an attorney who has not done so himself.'" *In re Woodward East Project, Inc.,* 195 B.R. 372, 375 (Bankr.E.D.Mich.1996).

B. *Compensable Work Must Provide Benefit to the Estate*

 In order to be compensated for work performed, the fee applicant must show that the services performed were "reasonably likely to benefit the debtor's

estate." 11 U.S.C. § 330(a)(4)(A)(ii)(I). While § 330 requires a determination that the services were "reasonably likely to benefit the estate", there is no requirement that the services at issue resulted in an actual benefit to the estate. 2 Lawrence P. King, *Collier on Bankruptcy,* § 330.04[5][c](15th ed.2003). "[T]he Court must judge the nature of the services and the necessity for them as of the time the work was performed." *In re James Contracting Group, Inc.,* 120 B.R. 868, 872 (Bankr.N.D.Ohio 1990). A bankruptcy attorney should not be penalized solely for the lack of success of a Chapter 11 reorganization. *Id.* at 872–73. Instead, the Court should evaluate the services provided based on whether counsel exercised its best judgment in performing those services. *Id.* Specifically, the *James Contracting* court sets forth the following standard:

> ... counsel who undertake to represent debtors cannot be required to predict the ultimate outcome of a Chapter 11 reorganization. Indeed, whether they are to be compensated cannot be based upon the success of the reorganization. Such a test would require debtor's counsel to also be debtor's guarantors... The performance of debtor's counsel must always be judged after the fact. Nevertheless, the Court must judge the nature of the services and the necessity for them as of the time the work was performed. The test for rendering such a decision is whether counsel exercised their best judgment in performing the services.

*Id.* at 872–73 (*citing In re Garrison Liquors, Inc.* 108 B.R. 561, 564 (Bankr.D.Md. 1989)).

■ With respect to whether the attorneys at Foley & Lardner exercised their best judgment in performing the services at the time the work was performed, the Court finds that they did not. With respect to maximizing the assets available for distribution, Foley & Lardner was retained to perform two significant tasks: (1) defend the Debtor in an Ohio state court environmental action; and (2) sell any valuable assets.[1] Before determining what amount of resources to expend in defending the Ohio state court action and in selling the Debtor's assets, Foley & Lardner needed to determine if the costs incurred would potentially result in a net benefit to the estate.

With respect to the Ohio state court action, it appears that Foley & Lardner knew from the outset that they did not have a winning case. The Court makes this conclusion based on Foley & Lardner's minimal preparation for the Ohio state court trial and its inadequate representation of the Debtor at trial. With respect to Foley & Lardner's minimal pretrial preparation, the witness for the state of Ohio testified that Foley & Lardner completed minimal pre-trial work, merely representing the Debtor during status conferences with the state court judge and in settlement discussions. (May 6, 2003 Hearing, Transcript, p. 12). Foley & Lardner did not make any discovery requests on the State of Ohio and failed to file a pretrial statement as requested by the Court (May 6, 2003 Hearing, Transcript, p. 12).

The Court also finds that Foley & Lardner did not adequately represent the Debtor at the Ohio state court trial. Specifically, the witness for the state of Ohio testified that:

---

1. Of course, Foley & Lardner represented the Debtor in other matters within the bankruptcy. The bulk of Foley & Lardner's hours (71% of all time billed), however, was in the "Asset Distribution" and "Litigation" billing categories.

1. Foley & Lardner showed up for the first day of trial with the goal of settling the case and were not prepared to defend the case at trial. (May 6, 2003 Hg, Trans., p. 12).

2. Foley & Lardner appeared at the trial with no client representative (May 6, 2003 Hg, Trans., p. 12);

3. Foley & Lardner appeared at trial without any experts to provide technical support in this complicated environmental litigation (May 6, 2003 Hg, Trans., p. 12);

4. Foley & Lardner did not present any witnesses, expert or otherwise (May 6, 2003 Hg, Trans., p. 24);

5. Foley & Lardner entered no exhibits and presented no evidence (May 6, 2003 Hg, Trans., p. 24);

6. Foley & Lardner did not bring an environmental lawyer to trial to participate in the litigation (May 6, 2003 Hg, Trans., p. 14);

7. Foley & Lardner did not appear on time for trial on either trial day (May 6, 2003 Hg, Trans., pp. 15, 22); and

8. Foley & Lardner did not present an opening statement (May 6, 2003 Hg, Trans., p. 18).

When asked about the benefit of Foley & Lardner's representation to the Debtor at the state court trial, the witness for the state of Ohio testified:

Q: Based upon your observations during the two-day trial, was Foley & Lardner's trial representation of any benefit to New Boston Coke? (May 6, 2003 Hg, Trans., p. 25).

A: Like I said, I was very surprised that these attorneys even stayed for the trial, given that they had no witnesses to present, they appeared not to really understand environmental law and the violations we were alleging. New Boston Coke would have been just as well off had no attorneys been there for that trial. In fact, they may have been better off in that regard.

So, no, I—I don't see any benefit to merely sitting there at counsels' table peppering in misguided objections from time to time, conducting wandering cross-examinations. That's not real defense of a case, and I certainly during those two days didn't see any benefit. (May 6, 2003 Hg, Trans., p. 26).

Attorneys from Foley & Lardner questioned the State of Ohio's witness on cross-examination about his view on the benefit of Foley & Lardner's representation to the Debtor's estate, and the following exchange occurred:

Q: Just—just so I understand, you indicated earlier that you think that New Boston Coke would have been better off without any representation?

A: They may have.

Q: Okay. So it's your position, then, that Foley & Lardner should have just not appeared for the trial in Ohio and allowed its client not only to have a judgment entered against it but a default judgment entered against it for not appearing at trial. That's your position.

A: When the alternative is being present for a case that you don't understand, yes, that's my contention. It's a waste of money otherwise.

Q: They should have just let a default judgment be entered against them.

A: Just—just like they were indicating in conversations leading up to the trial, there was no reason for them to show up at trial because there was no case to put on, and really

they didn't have the expertise to defend the case that the State was presenting. (May 6, 2003 Hg, Trans., p. 42–43).

Based on the witness testimony, this Court concludes that Foley & Lardner's representation of the Debtor in the Ohio state court litigation did not benefit the bankruptcy estate.

The Court then must determine whether Foley & Lardner exercised sufficient judgment with respect to resources expended in defending the Debtor in the state court action in order to garner the most favorable result for the creditors of the estate. In other words, the Court must determine whether Foley & Lardner, having known the strength of its defense (or lack thereof), minimized its costs to the estate in order to preserve as much of the estate's assets as possible for the benefit of creditors. Based on the testimony presented, the Court finds the Foley & Lardner did not exercise the requisite judgment. Instead, Foley & Lardner provided the Debtor with cursory representation at premium prices. To Foley & Lardner's credit, it agreed to a reduction of fees as a result of the state of Ohio's objection, even while maintaining that it provided necessary and competent representation for the Debtor in the Ohio state court action.

With respect to the amount of the resources expended by Foley & Lardner to effectuate the sale of the Debtor's assets, the Court also finds that Foley & Lardner did not exercise sufficient judgment. Early in the case, Foley & Lardner knew, or should have known, that the estate contained few valuable assets. Although the schedules listed a number of pieces of real property with an aggregate stated value of $3,398,514.32, an overpayment of environmental emission report fees valued at $565,000, and machinery and equipment at over 4 million dollars, Foley & Lardner became aware at a very early date that the Debtor had a large environmental problem with the state of Ohio and the values of the assets as set forth in the schedules were overstated. The real property was contaminated, any overpayments made to the Ohio EPA could potentially be offset for amounts owed, and machinery and equipment were subject to deterioration as a result of disuse or sabotage. Because the coke ovens, machinery and equipment had all been destroyed prior to the commencement of the bankruptcy case, Foley & Lardner also knew that the Debtor had no possibility of reorganization and no value as a going concern.

Further, even if Foley & Lardner did not realize that the assets were worth substantially less than indicated on the schedules, Foley & Lardner was aware at the outset that the estate owed, at least, $9 million on its secured claims to the PBGC and IRS. On October 29, 2002, large proofs of claim were filed by the PGBC, IRS and Ohio EPA totalling almost $17 million dollars. Additionally, on December 20, 2002, the Scioto County Court issued a 2.6 million dollar judgment against the Debtor in the Ohio state court environmental action, for civil penalties alone. And, in December 2002, Foley & Lardner filed a Motion for Order Permitting Surcharge of Professional Fees up to $500,000.00, an apparent indication that the law firm believed the estate was administratively insolvent. For these reasons, Foley & Lardner should have moved quickly to sell or abandon the Debtor's assets and made an effort to limit the amount of funds expended in doing so.

At the hearing on July 11, 2003, Foley & Lardner stated that there were actually only three major assets in this case: (1) Air Emissions Credits, potentially worth $200,000—$400,000, but not yet sold; (2) real property consisting of the Debtor's boiler house, electrical substation, and

parking lot which was sold to the Southern Ohio Port Authority ("SOPA") in January 2003 for $160,516; (3) two contaminated parcels of real property which sold for a total of approximately $25,000 in May 2003. Assuming that the Air Emissions Credits will sell for $400,000 (the highest estimate), the total amount of assets generated for the estate by Foley & Lardner would be $585,516. If the Air Emissions Credits sell for any less than $315,000.00, or are never sold, Foley & Lardner's requested fees will greatly exceed the value of the assets of the estate.

 its defense, Foley & Lardner contends that the sale of the contaminated real property to SOPA is actually worth more to the estate than the $160,516 sale value because SOPA agreed than it would be primarily responsible for cleaning the site and remedying the environmental issues, thus relieving the Debtor of the financial burden of cleaning-up the property, providing a cost-savings to the estate anywhere from one– to three-million dollars. While the Court agrees that relieving the estate of a large financial burden should often be included when valuing the estate, in this case it would be inappropriate to do so. This estate is administratively insolvent and, therefore, the relief of the financial burden of having to pay for an environmental clean-up cannot benefit the bankruptcy estate. The Debtor cannot pay for *any* environmental clean-up, whether it be many millions of dollars or three-million less than that. The sale of the real property provided a benefit to the estate in the amount of $160,516.

In reviewing the Fee Application, the Court finds that an excessive amount of fees were generated, especially when considered in light of the benefit of the services provided to the estate. In the end, Foley & Lardner only brought in $185,516 (with the potential to bring in $400,000

more from the sale of Air Emissions Credits) to the estate from the sale of assets yet Foley & Lardner's total fees and expenses, taking into account the stipulated fee and expense reductions, totaled almost $500,000.00.

## C. Questionable Billing Practices

The Court has identified nine different questionable billing practices found within Foley & Lardner's Fee Applications:

### 1. Time Spent with Summer Associates and Law Clerks.

 Billing for time spent with summer associates is not compensable. "Time spent by non-paid interns, summer associates, and staff whose salaries can ordinarily be viewed as part of a firm's overhead" should not be included in the fee application. *In re ACT Manufacturing, Inc.*, 281 B.R. 468, 485 (Bankr.D.Mass.2002). Foley and Lardner included one hour of attorney time and 25.1 hours of paraprofessional time in its Fee Applications for the work of its summer associates and law clerks. Compensation for this work will be disallowed.

### 2. Time Spent in Defense of Fee Applications.

[12] general rule is that attorney time for defending fee applications is not compensable. *In re Riverside–Linden Investment, Co.*, 945 F.2d 320 (9th Cir.1991). The allowance of fees for defending a fee application would encourage the presentation of excessive fees because either the attorneys would be granted those excess fees or the attorneys could recover the costs of unsuccessfully litigating and defending such a request. *Id.* at 323. In this case, attorneys from Foley & Lardner

billed 73.1 hours for defending their fee application, none of which is compensable.[2]

### 3. *Duplication of Effort*

 Bankruptcy Code § 330(a)(4)(A)(i) specifically disallows compensation for the unnecessary duplication of services. In this case, Foley & Lardner billed 20.7 hours in the category of Plan and Disclosure Statement. At the hearing on July 11, 2003, an attorney for Foley & Lardner indicated that attorneys for Foley & Lardner did not draft the Plan and Disclosure Statement. The Plan and Disclosure Statement was drafted by Debtor's counsel. Nonetheless, numerous entries reference the preparation of the "Liquidating Plan" and the "review of draft Plans". Most of this work appears to be duplicative and, therefore, not compensable. No explanation was presented to explain why Foley & Lardner attorneys, who did not draft the Plan, were needed to bill the Debtor's estate for Plan-related work. Furthermore, because the Plan and Disclosure Statement were not complex and because the Plan was a straight-forward liquidating Plan, it is unclear to the Court why Foley & Lardner needed to bill 20.7 hours with respect to the Plan and Disclosure Statement and can only assume that its efforts were mostly duplicative. There-

fore, 90% of the fees generated in this category are non-compensable.

### 4. *(a) Excessive Number of, and Unnecessary Use of, Intra–Office Conferences and (b) Intra–Office Conferences Billed by Multiple Attorneys, without Sufficient Justification.*

#### (a) *Excessive Number of, and Unnecessary Use of, Intra–Office Conferences.*

 Foley & Lardner billed the bankruptcy estate for an excessive number of intra-office conferences. Courts have reduced fees for the excessive use of intra-office conferences. *In re Leonard Jed Co.,* 118 B.R. 339, 347 (Bankr.D.Md.1990)("excessive use of office conferences and unnecessary duplication of effort will result in reduction of fees when they are unreasonable....") During the period of the Fee Application, which spans thirteen months (from July 13, 2002 through August 13, 2003), Foley & Lardner attorneys held 567 intra-office conferences which accounted for 788.9 hours of the 1737.7 total attorney hours billed. In other words, 45.4% of the total attorney hours billed were billed for intra-office conferences.[3]

To further illustrate the overuse of intra-office conferences, on one day, that

---

**2.** Not all entries listing items constituting defense of the Fee Application(s) were listed in the "Fee/Employment Applications" billing category. Some entries were found in "Asset Distribution", "Business Operations", "Case Administration and Objections", "Claims Administration", and "Litigation" categories.

**3.** When the daily time entries "lumped" together multiple tasks in a single time entry, the Court attributed the entire entry to the intra-office conference. The Fee Applicant has the burden of presenting a Fee Application to the Court with entries which accurately describe the task and the amount of time attributable to that task. *In re Huhn,* 145

B.R. 872, 875 (W.D.Mich.1992)("Because the applicant has the burden of proof on the reasonableness of the fees, courts properly reject fee applications when the documentation is insufficient for the court to make a determination of the reasonableness of the charges.") It is not the Court's job to attempt to discern which portion of the time entry was attributable to the intra-office conference. *In re Pinkins,* 213 B.R. 818 (Bankr.E.D.Mich. 1997)("The court will not indulge in extensive guesswork to justify a fee for an attorney who has not done so himself.") *See also* discussion on "lumping", section 7, *supra.*

being November 25, 2002, Foley & Lardner's attorneys billed for six different intra-office conferences. The relevant time entries for November 25, 2002 read (with the intra-office conferences set forth in boldface type):

| 11/25/02 | LMKR | **Office Conference with Attorney L. Benfield** regarding sale of Nox and SO2 credits; research regarding same | 1.70 |
|---|---|---|---|
| 11/25/02 | AJT | Receipt and review of bankruptcy comments on purchase agreements; **conference with Mr. P. Astolfi** regarding same; receipt and review tax id numbers | .70 |
| 11/25/02 | LEB | Review SOPA agreements; telephone **conference with Mr. P. Astolfi** regarding same; telephone conference with Mr. F. Dery regarding same; **conference with Ms. L. Krider** regarding NOX credits. | 1.10 |
| 11/25/02 | SABA | **Office conference P. Astolfi; office conference A. Tavi** regarding revision of purchase agreement; review draft agreement. | 1.00 |

It appears from the Fee Application that the five attorneys with time entries on November 25, 2002 billed for a total of six conferences, those being: (1) LMKR with LEB; (2) AJT with PJAS; (3) LEB with PJAS; (4) LEB with LMKR; (5) SABA with PJAS; and (6) SABA with AJT. While only one conference was clearly double-billed (LEB with LMKR and LMKR with LEB), it is clear that a large portion of the billed-for time on November 25, 2002 involved intra-office conferences. This pattern of billing for multiple intra-office conferences on a single date is repeated throughout the Fee Application. The Court further wishes to note that its analysis only concerns intra-office conferences and not conferences with Debtor's counsel or with the Debtor's representative.

Foley & Lardner claims that its many intra-office conferences were necessary and justifiable because, during those conferences, Foley & Lardner attorneys were either coordinating litigation and environmental practitioners or guiding the younger attorneys assigned to the case. In response to the Court's questions regarding the use of the intra-office conference, Foley & Lardner's senior bankruptcy counsel stated:

those conferences we felt were necessary. And I will note that on a number of occasions I participated in those and did not bill my time which is the highest billing rate among all of the attorneys in the group.

Those were necessary because this was such a fluid situation, Your Honor. And we were trying to comply as best we could with the judgment that was entered and also trying to implement the sale. And quite honestly, Your Honor, it was very difficult representing this debtor because Mr. Dery was often hard to reach. It would sometimes take days before we could get judgments—or get his—his input on what to do in particular situations.

And so as I say, it was a very difficult and very fluid engagement and we tried to use younger but highly qualified attorneys who had lower rates. But as a result, it was necessary frequently to discuss things from the litigation perspective as well as from the environmental prospective and try to coordinate our activities as best as possible. And that—that was the purpose of the numerous meetings.

(July 11, 2003 hearing, Transcript p. 22—23). In summary, Foley & Lardner appears to be claiming that conferences were necessary to guide less-experienced attorneys and that less-experienced attorneys were utilized as a cost-savings measure.

 Generally, holding an intra-office conference for the purpose of training attorneys is not compensable. *In re Big Rivers Elec. Corp.*, 233 B.R. 768, 780 (Bankr.W.D.Ky.1999), *rev'd on other grounds*, 252 B.R. 393 (W.D.Ky. 2000)("[w]hile training and reviewing the work of associates and new professionals are necessary functions, the costs associated therewith are [overhead] expenses to the firm.") Although training conferences are generally not compensable, there are times when law firms can justify billing a debtor for the services of two or three attorneys at an intra-office conference—at the beginning of a case to assign work, or at a critical juncture in the case to define duties, or to delegate jobs and then to have people perform those jobs, or to discuss the status of various matters in a large and complicated bankruptcy. In this case, many conferences appear to be training conferences. They are held successively, with nothing happening between the conferences or with only a single task occurring between the conferences.

Foley & Lardner's claim that many of the conferences were necessary because, as a cost-savings measure, less-expensive attorneys were used to administer this case, and more experienced attorneys were needed to provide guidance to those less-expensive attorneys, is also not persuasive. Notably, two of these less expensive attorneys, who billed more than 1000 hours on this case, had hourly billing rates in the Final Fee Application of $235.00 per hour and $275.00 per hour, and both graduated from law school in the year 2000.[4] Therefore, the Court does not see the advantage gained by shuffling the work to less-expensive attorneys, whose rates are much higher-than-average for attorneys just a few years out of law school, which then necessitated holding hundreds of intra-office conferences.

(b) *Multiple Attorneys Billing for the Same Intra–Office Conference without Justification.*

 Just as a Foley & Lardner may not be compensated for an excessive number of intra-office conferences, even when a conference is justified and appropriate, no more than one attorney may charge the estate for intra-office conferences unless the attorney provides a valid reason for why more than one attorney was needed to participate in a particular conference. *In re Bass*, 227 B.R. 103, 109 (Bankr. E.D.Mich.1998) ("[g]enerally, 'no more than one attorney may charge the estate for interoffice conferences, meetings, and court appearances unless an adequate explanation is given.'") Case law has also held that, in situations where more than one attorney attends a hearing or conference, there must be a showing that each attorney contributed to the hearing or conference. *In re Microwave Products of America*, 102 B.R. 661, 665 (Bankr. W.D.Tenn.1989). The Trustee Fee Guidelines, section (b)(4)(v), also adopts this tenet, stating "[i]f more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees."

For many of the intra-office conferences held by attorneys at Foley & Lardner,

---

4. The Court notes that Debtor's counsel, a 1981 law school graduate who has practiced bankruptcy law in this district extensively, billed this estate $220.00 per hour for his services.

multiple attorneys requested fees for their participation. In fact, a total of 106.5 hours was billed by multiple attorneys for ostensibly the same intra-office conference without adequate explanation as to why the services of up to four attorneys were required.[5]

In summary, both because Foley & Lardner attorneys billed for an excessive number of intra-office conferences and because multiple attorneys billed for many of the same conferences without adequate explanation, the Court will disallow 90% of the fees relating to those intra-office conferences.

### 5. *Unjustifiably High Hourly Rates.*

 Bankruptcy attorneys are generally entitled to a hourly fee in line with the prevailing market rates in the community. *ACT Manufacturing,* 281 B.R. at 486 ("[T]he Court should apply the rate customarily charged for similar services in the locality . . .") The Court may, itself, determine the prevailing market rate in the community and thus evaluate the reasonableness of the attorneys' hourly rates. *In re Computer Learning Centers,* 285 B.R. 191, 227 (Bankr.E.D.Va.2002). The *Computer Learning* court states,

> The court is in an excellent position to evaluate the prevailing market rate for attorney's fees by virtue by the innumerable fee applications presented to the court. (footnote omitted). The very number of applications provides an exceptional view of the breadth and depth of the legal community and the fees charged . . . Absent the application of other factors . . ., bankruptcy counsel

should not have an expectation of compensation in excess of [market rate].

*Id.* In this case, the hourly rates of the Foley & Lardner attorneys ranged from $175.00[6] to $465.00. These rates, which are on the high end of hourly rates typically awarded for bankruptcy work in Detroit, are not necessarily justified given the quality of the work performed, the outcome of the case, and the fact that this case was a simple liquidating chapter 11. Therefore, a 20% reduction in hourly rates is warranted.

### 6. *Excessive Time Spent Producing Fee Applications.*

 Time spent generating fee applications is generally limited to 5% of the total fees requested. "Absent exceptional circumstances, fees for the preparation of fee applications should be limited to 5% of the total fees requested." *In re Bass,* 227 B.R. 103, 109 (Bankr.E.D.Mich.1998). In this case, Foley & Lardner attorneys and paraprofessionals devoted more than 5% of the time billed to "Fee/Employment Applications". The Court will reduce the number of hours allowed for production of the Fee Application(s) to the maximum 5% of all allowable hours.

### 7. *"Lumping" of Tasks into Single Time Entries.*

 In order for a task to be compensable, that task must be set forth in detail in the Fee Application. Each task must be listed separately and not combined, or "lumped" with other tasks so that the Court can discern whether a reasonable amount of time was spent performing that

---

**5.** Again, the Court attributed the entire time entry to the intra-office conference when the daily time entries "lumped" together multiple tasks in a single time entry. It is not the Court's job to attempt to discern which portion of the time entry was attributable to the intra-office conference. *See* footnote 3.

**6.** Just eight of the 1,737.7 hours were billed at the $175.00 billing rate.

task. The Trustee Fee Guidelines codify this requirement in section (b)(4)(v) which states,

> ... Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a *de minimis* amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate...

The prohibition against "lumping" has been recognized by a number of courts. *Copeland*, 154 B.R. at 702; *ACT Manufacturing*, 281 B.R. at 483. Authority exists for disallowing *in toto* all services which have been "lumped" together. *Copeland*, 154 B.R. at 702. This case is replete with lumped entries, two examples of which follow:

| Date | Attorney | Tasks Performed | Hours Billed |
|------|----------|-----------------|--------------|
| 5/21/03 | LMKR | Continue revisions to monthly status report; telephone conference with Mr. G. Mains regarding court submission for remaining boiler house materials; research regarding implications on air emission audits if sell boiler house; telephone conference with Mr. D. Beam and Waste Tron regrading disposal of WAL; telephone conference with attorney G. Poulos regarding access issue; draft deed language; office conference with attorney L. Benfield regarding air credits; draft correspondence to Ohio EPA regarding deed language and access agreement. | 4.30 |
| 5/22/03 | LMKR | Prepare announcements for auctioneer; office conference with attorney L. Benfield regarding same; office conference with Mr. G. Mains regarding court submittal regarding regulated substances; office conference with P. Astolfi regarding auction; travel to Columbus, Ohio; revise progress report to court; telephone conference with attorney G. Poulos regarding access issues; office conference with attorney L. Benfield regarding boiler house inventory to be submitted to court; office conference with attorney P. Astolfi regarding auction announcements. | 10.70 |

Almost every entry in the Foley & Lardner Fee Application contains lumping. Generally, it is appropriate for the Court to make a reduction for lumping. In this case, however, no specific reduction for lumping will be made because many of the lumped entries have already been disallowed as part of other reductions.

8. *Excessively long days.*

▮ Bankruptcy attorneys are not entitled to compensation merely because time recorded was actually expended. *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 886 (Bankr.W.D.Ky.1996). Billable hours do not necessarily translate into compensable hours. *Id.*

▮ There are eighteen time entries which show attorneys billing more than ten hours per day, including two entries billing nineteen and twenty hours, respectively:

| Date | Atty | Description | Hours Billed |
|------|------|-------------|--------------|
| 10/15/02 | PJAS | Travel to Portsmouth, Ohio for Ohio EPA trial; negotiate with assistant Ohio Attorneys General regarding consent order; represent client at trial in Scioto County Court of Common Pleas on matter Ohio v. New Boston Coke Corporation; travel from Portsmouth, Ohio to Columbus, Ohio to meet with Mr. S. Barbatano; confer with Mr. M. Aiello and Mr. S. Barbatano regarding trial strategy for damages mitigation and effect of Bankruptcy Code on state court proceeding. | 19.60 |
| 10/16/02 | PJAS | Review and revise memorandum of law regarding bankruptcy stay of state agency proceeding in state court; travel from Columbus, Ohio to Protsmouth, Ohio; negotiate with assistant Ohio Attorneys General regarding consent order; represent client at trial in Scioto County Court of Common Pleas on matter of Ohio v. New Boston Coke Corporation; travel from Portsmouth, Ohio to Detroit, Michigan. | 20.50 |

Except in unusual circumstances it is not realistic for an attorney to bill in excess of six to seven hours per day. *In re Associated Grocers of Colorado*, 137 B.R. 413, 426 (Bankr.D.Colo.1990) *citing Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983). While it is certainly possible that an attorney could bill ten–, nineteen– or twenty-hour days, it is unlikely that all of that billed time is compensable. In any event, great specificity is required to show that amount of time was necessary and that the attorney actually performed tasks that benefitted the estate, and that specificity was not provided here. Again, because many of the entries for excessively long days have already been disallowed as part of other reductions, no further reductions will be taken.

### 9. *Excessive Staffing.*

■ Foley & Lardner engaged the services of sixteen of its attorneys and four para-professionals to administer this case. Twelve attorneys billed for "Litigation", seven for "Asset Disposition", six for "Employee Benefits/Pensions", five for both "Business Operations" and "Case Adminis-

tration and Objections", four for "Fee/Employment Applications", and three for "Claims Administration and Objectives". The Fee Application provides no explanation as to why so many professionals were needed to administer this relatively small (2.6 million in estimated assets) liquidating Chapter 11 case. While the Court disfavors the practice of excessive staffing, no reduction will be taken for this practice.

### D. *Procedure for Reduction of Fees*

Based on the discussion above, the Court will make the following reductions: (1) for the "stipulated" fee reduction resulting from the state of Ohio's objection; [7] (2) for time billed by summer associates and law clerks; (3) for time spent in defense of the fee application(s); (4) for 90% of the time spent with respect to the Plan and Disclosure Statement; (5) for 90% of all charges for intra-office conferences; and (6) for time billed for preparation of fee/employment applications over 5% of allowable hours billed.[8] The Court will then reduce the blended hourly rate for

---

**7.** It is unclear the exact amount of the stipulated reduction. The Court, however, has determined that the state of Ohio objected to 101 hours of fees and will reduce Foley &

Lardner's fees according to the procedure set forth herein.

**8.** Because so many of the time entries contained "lumping", it was impossible for the

attorneys by 20%. The Court is not making any further reductions for "lumping", nor is the Court making any specific reductions for excessive staffing and excessively long days, although the Court wishes to note that it disfavors such practices.

To determine the amount of allowed fees, the Court will start with the total attorney hours billed, that being 1737.7. From that the Court will disallow the following hours:

| 1. | State of Ohio's Objection | 101 hours |
|----|---------------------------|-----------|
| 2. | Time Billed by Summer Associates and Law Clerks | 1 hour |
| 3. | Time Spent Defending the Fee Applications | 73.1 hours |
| 4. | 90% of Time Billed for the Plan/ Disclosure Statement | 18.6 hours |
| 5. | 90% of Time Billed for Intra–Office Conferences | 710 hours |

After making the above adjustments, Foley & Lardner is left with 834 allowable attorney hours. Of these hours, 54.1 hours were devoted to work related to "Fee/Employment Applications", which totals 6.5% of the total attorneys fees requested. Because time spent compiling Fee Applications is generally limited, absent exception circumstances, to 5% of the total fees requested, the Court further reduces the allowable attorney hours by 12.4. The remaining, and allowable, 821.6 hours will then be multiplied by 80% of the blended hourly rate for attorneys, that being $226.03. The Court will be using the blended hourly rate, rather than the actual hourly rates billed, in calculating a reduction because the Fee Application contains so many lumped entries, and, therefore, it is impossible for the Court to determine which specific entries to disallow. After performing these calculations, the Court has determined that Foley & Lardner is

entitled to $185,706.24 in allowable attorney fees.

With respect to the paraprofessional fees, Foley & Lardner billed 67.3 hours. The Court has determined that 25.1 of these hours are attributable to law clerks and summer associates. Time spent by summer associates and law clerks is part of overhead, and is, therefore, not compensable. *ACT Manufacturing, Inc.*, 281 B.R. at 485. Of the remaining 42.2 allowable paraprofessional hours, 11.6 of those hours were devoted to work related to "Fee/Employment Applications", which totals 27.5% of the total paraprofessional fees requested, an amount greater than the 5% generally allowed. Therefore, the Court further reduces the allowable paraprofessional hours by 9.5 hours. The remaining, and allowable, 32.7 hours are compensable at a blended paraprofessional hourly rate of $119.31, resulting in allowable paraprofessional fees of $3,901.44.

### E. Procedure for Reduction of Expenses

The expense portion of Foley & Lardner's Fee Application links various professionals and para-professionals with specific expenses such as copying, travel and long-distance phone usage. For this reason, the Court was concerned when the expense report contained many items, such as copy, fax and phone charges, linked to eleven attorneys and others who were not listed elsewhere in the Fee Application. The Foley & Lardner web-site indicated that two of the individuals billing expenses to the estate are office managers in the Detroit, Michigan and Madison, Wisconsin offices, respectively, another is the "Director of Legal Recruitment and Profes-

---

Court to designate specific entries to eliminate and, therefore, must make these across-the-board reductions. The Court, however, has been careful to disallow a specific time entry only once, even if it contains multiple

problems (i.e. an intra-office conference regarding the defense of the Fee Application or an intra-office conference with a summer associate).

**450**

sional Development", yet another is an attorney who is a member of the Intellectual Property Department located in Washington, D.C., and yet another is an attorney who is an associate in the Tax & Individual Planning Department, Estates & Trusts Practice Group located in Tampa, Florida. This case does not appear to require the skills of two office managers, a director of recruitment, or attorneys with specialities in intellectual property or individual trusts & estates.

When questioned about these expenses, Foley & Lardner responded that all of the expenses charged are attributable to Debtor's case, with perhaps one exception concerning a listed expense in the amount of $8.25 for copies made on December 23, 2002. Foley & Lardner believes, but cannot verify, that these copies were associated with the Debtor's bankruptcy and has agreed to withdraw its request for reimbursement of the $8.25.

With respect to the expenses attributed to the eleven attorneys and others not identified elsewhere in the Fee Application(s), Foley & Lardner only addresses the expenses attributed to an attorney identified as "PJA". With respect to the expenses of "PJA", Foley & Lardner asserts that those expenses are actually the legitimate expenses for this case incurred by "PJAS" and that the expense report mistakenly lists the expenses of "PJAS" as being those of "PJA". Foley & Lardner did not address any of the other expenses attributed to the others (i.e. office managers, director of recruitment, individual estate planning attorneys, etc.) who were not included elsewhere in the Fee Application(s).

With respect to the expenses requested by Foley & Lardner, this Court denies $1,961.92 for all expenses relating to people that were not included as professionals in Foley & Lardner's Fee Application(s) with the exception of "PJA". The Court finds it plausible that expenses attributable "PJAS", one of the primary billers on this case, were mistakenly attributed to "PJA".

The Court also denies $1,387.41 in expenses relating to the October 2002 trial in Scioto County, Ohio because all legal fees were disallowed for that trial. The Court also reduces the allowed expenses by the amount of the stipulated reduction, $8.25. As a result of these reductions, the Court is allowing a total of $16,733.91 for expenses.

### III.

### CONCLUSION

For the above-stated reasons, this Court grants Foley & Lardner's fees in the amount of $185,706.24 and expenses in the amount of $16,733.91.